**Catherine J. HEALY et al., Plaintiffs,**

**v.**

**F. Don JAMES et al., Defendants.**

**Civ. A. No. 13721.**

United States District Court,
D. Connecticut.

April 24, 1970.

Alvin Pudlin, Abraham S. Silver, Pudlin & Silver, New Britain, Conn., for plaintiffs.

F. Michael Ahern, Asst. Atty. Gen., State of Connecticut, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

This case was submitted to the Court on a stipulation of facts agreed to by counsel. The plaintiffs are students at Central Connecticut State College (CCSC) and the defendants are CCSC administrators or members of its Board of Trustees. Jurisdiction is alleged pursuant to 42 U.S.C. § 1981 and § 1983, 28 U.S.C. § 1343(3) and (4), and Article III, § 2 of the Constitution. The plaintiffs are claiming deprivation of their constitutional rights under the first, fifth and fourteenth amendments to the federal constitution.

The plaintiffs, following the established procedures, sought official recognition by the college for an organization to be known as a local chapter of the Students for a Democratic Society. (SDS). Such a status of official recognition entitles the organization to announce its activities in the campus newspaper, have access to post notices on the college bulletin boards, and have assigned to them at their requests, college facilities for meetings and a faculty adviser. Recognition does not thereby entitle an organization to college financial support. In accordance with the established procedure, the plaintiffs submitted their application to defendant Judd, the Acting Dean of Student Affairs; it contained a written statement of the purposes, the names of the officers and the procedures of the proposed organization.[1] It stated therein that the CCSC students for a Democratic Society were not under the dictates of any national organization. Dean Judd and President James of CCSC were further orally informed by some of the petitioners, that their organization would in no way be affiliated with, or owe allegiance to the officers of any national organization known as the SDS.

The declared purposes of the organization set out in the petition to the Student Personnel Committee requesting official recognition were as follows:

"1. Because the university is intended to be the arena of education, where there is an unfettered exchange of ideas, S.D.S. would provide *a forum* of discussion and self-education for students developing an analysis of American society and institutions, including higher education, and the world situation in general.

"2. Because it is felt that ideas without parallel in deeds are empty and ephemeral, and that no area of life exists in a vacuum and unrelated to all other areas of life. S.D.S. would provide *an agency* for integrating thought with action so as to bring about constructive changes in the university, in American life, and the world.

"3. Because of the responsibility of all peoples for the welfare of others, S.D.S. would provide a *coordinating body* for relating the problems of leftist students and other groups, such as the student body as a whole, the working class, the black populace or whatever other individuals or groups in fact or potentially in accord with the purposes of the CCSC chapter of S.D.S." Petitioners' Exhibit A.

This application was referred to the Student Personnel Committee, an advisory group consisting of the Dean of

---

1. Plaintiffs' Exhibit B.

Students, three faculty members, and four students, whose function it was to review and recommend policies concerning student affairs. This group favorably voted six to two to recommend to President James that the SDS chapter be given official recognition by the administration as a campus organization. Notwithstanding the committee's recommendation, James denied them official recognition and accompanied it with the following statement:

"I am disapproving recognition of a local chapter of Students for a Democratic Society.

"Though I have full appreciation for the action of the student Affairs Committee and the reasons stated in their minutes for the majority vote recommending approval of a local chapter of Students for a Democratic Society, it is my judgment that the statement of purpose to form a local chapter of Students for a Democratic Society carries full and unmistakable adherence to at least some of the major tenets of the national organization, loose and divided though that organization may be. The published aims and philosophy of the Students for a Democratic Society, which include disruption and violence, are contrary to the approved policy (by faculty, students, and administration) of Central Connecticut State College which states:

'Students do not have the right to invade the privacy of others, to damage the property of others, to disrupt the regular and essential operation of the college, or to interfere with the rights of others.'

"The further statement on the request for recognition that 'CCSC Students for a Democratic Society are not under the dictates of any National organization' in no way clarifies why if a group intends to follow the established policy of the College, they wish to become a local chapter of an organization which openly repudiates such a policy.

"Freedom of speech, academic freedom on the campus, the freedom of establishing an open forum for the exchange of ideas, the freedoms outlined in the Statement of Rights, Freedoms and Responsibilities of Students that 'college students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right of petition,' —these are all precious freedoms that we cherish and are freedoms on which we stand. To approve any organization or individual who joins with an organization which openly repudiates those principles is contrary to those freedoms and to the approved 'Statement on the Rights, Freedoms, and Responsibilities of Students' at Central." Petitioners' Exhibit D.

Prior to the current incident, the school administration, with faculty approval, had commendably adopted and generally promulgated a written set of school policies defining the "Rights, Freedoms, and Responsibilities" of students at the college. Article V, Section E thereof, provides:

"College students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right to petition. Students do not have the right to deprive others of the opportunity to speak or be heard. * * *" Petitioners' Exhibit B.

Following the disapproval action by President James, some of the petitioners, along with other students not herein parties, met at a campus coffee shop to discuss the President's action. During this meeting they were approached by defendants Judd and Clow, the latter being the Dean of Administrative Af-

fairs at CCSC, and served with a memorandum which stated:

"Notice has been received by this office of a meeting of the 'C.C.S.C.—S.D.S. on Thursday—November 6 at 7:00 p. m. at the Devils' Den'.

"Such meeting may not take place in the Devils Den of the Student Center nor in or on any other property of the college since the C.C.S.C.—S.D.S. is not a duly recognized college organization.

"You are hereby notified by this action to cease and desist from meeting on college property." Petitioners' Exhibit E.

The respondents concede that at all times pertinent to the above events, the Board of Trustees for CCSC had knowledge of the actions of the defendants James, Judd and Clow and the Court thus infers that the action and the procedures followed were carried out with its approval.

Article III, § E of the school's policy statement, supra, provides in part:

"The judicial process shall be such that students have the right to appeal not only disciplinary action deemed unwarranted but also a college regulation or policy considered unjust. The decision of the appeal court shall be final, subject only to the student's appeal to the President of the College or ultimately to the Board of Trustees." Petitioners' Exhibit B.

Petitioners now seek an order from this Court restraining the defendants and their agents from interfering with them and others similarly situated from meeting as an organization and participating in activities as a local chapter of the SDS, and directing said defendants to afford said organization official recognition as a campus student organization.

The petitioners are not challenging the constitutionality of the standards established by the college for the recognition of campus organizations and thus that question is not before the Court. The plaintiffs do claim that their application for recognition does conform with the established standards and that defendant James' action in going outside that application and arbitrarily attributing to them aims and purposes not evidenced therein, without first affording them some form of a hearing was in itself a constitutional denial of procedural due process of law.

There is nothing in the stated purposes of the petitioners on the application itself which can be said to be inconsistent with the standards for recognition set by the college.[2] In fact, President James in his memorandum denying recognition, presents no claim to the contrary. His reasons for denying recognition were based on what he personally considered to be the aims and philosophy of the National Organization of the SDS. These aims and objectives he attributed to the petitioners and found them to be contrary to those established at CCSC. Thus it must be determined whether or not President James exceeded the bounds of procedural due process in going outside the application to consider factors which he regarded as being both factual and relevant.

▆ Those cases which deal with the rights of student social organizations generally recognize that a college may exclude or closely regulate such organizations in the furtherance of its academic, as opposed to its social, or other extra curricular activities. See Waugh v. Board of Trustees, 237 U.S. 589, 35 S. Ct. 720, 59 L.Ed. 1131 (1915); Sigma Chi Fraternity v. Regents of the University of Colorado, 258 F.Supp. 515 (D. Colo.1966), commented on in 39 U.Colo. L.R. 149 (1967); Webb v. State University of New York, 125 F.Supp. 910 (N. D.N.Y.1964). However, the foregoing cases are not determinative of the question presented here which relates to a campus political organization. These cases are distinguishable on at least two grounds: (1) a political organization,

2. Plaintiffs' Exhibit A.

by its very nature, is entitled to greater protection under the first amendment, and (2) the petitioners' challenge is primarily based upon procedural grounds, while the social organization cases dealt with substantive questions.

Similar considerations arise, other than those with which we are dealing, when circumstances require that the college administration rule on the question of permitting controversial visiting speakers to appear on the campus. This latter group of cases may be summarized in principle as follows:

> "No one has the absolute, unlimited right to speak on a university campus; however, when the university opens its doors to visiting speakers, it must follow constitutional principles if it seeks to regulate those whom recognized groups may invite." Smith v. University of Tennessee, 300 F.Supp. 777, 781 (E.D.Tenn.N.D.1969). See also Brooks v. Auburn University, 296 F.Supp. 188 (E.D.Ala.1969) and Snyder v. University of Illinois, 286 F. Supp. 927 (three-judge court, N.D.Ill. 1968).

Analogous holdings to those in the campus-speaker cases also exist in those cases which deal with the right of outside organizations to use university facilities for meetings and speeches. In Danskin v. San Diego Unified School District, 28 Cal.2d 536, 545–546, 171 P. 2d 885, 891, the Supreme Court of California stated:

> "The state is under no duty to make school buildings available for public meetings. * * * If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. ([N]or) * * * make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. A state is without power to impose an unconstitutional requirement as a condition for granting a privilege even though the privilege is the use of state property." See also Buckley v.

Meng, 35 Misc. 467, 230 N.Y.S.2d 924 (1962).

Cases dealing with disciplinary actions against students for the violation of university rules and regulations have also required that constitutional safeguards be followed. These cases require that the regulation under which the charge is made shall not be unduly vague and that the student charged be given notice of the charge and an opportunity for a hearing. See, e. g., Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961); Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wis. 1968); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D. Ala.1967).

■ The common theme adhered to in all of these cases is that state colleges and universities are not at liberty to adopt unduly vague regulations nor may they act arbitrarily under reasonable specific ones. See generally, Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027 (1967); Van Alstyne, The Judicial Trend Toward Student Academic Freedom, 20 U.Fla.L.R. 290 (1968); Symposium, Student Rights and Campus Rules, 54 Calif.L.R. 1 (1966); 45 Denver L.J. 497–678 (1968) (a series of articles dealing with various aspects of the student-university relationship). These same general principles necessarily apply in the case at bar.

■ The primary purpose of a college or university is to provide the best possible education for its students.

> "Unless (college) officials have authority to keep order, they have no power to guarantee education. If they cannot preserve order by rule and regulation, and insist on obedience to those rules, they will be helpless in the face of a mob, powerless to command or rebuke the fanatic, the irritant, the malingerer, the rabble rouser. To be sure, this is a tax supported institution, but this does not give license to chaos, or the hope to create chaos. The majority of the taxpayers who established, through

representative government, the institution, and all the taxpayers who support this institution, have a vested interest in a peaceful campus, an academic climate of order and culture. The power of the president to oversee, to rule, is an integral part of the mechanism for providing and promoting education at State College. Be that as it may, colleges, like all other institutions, are subject to the Constitution. Academic progress and academic freedom demand their share of Constitutional protection." Hammond v. South Carolina State College, 272 F.Supp. 947, 949 (D.S.C.1967).

Thus, a student may exercise his constitutional rights only so long as "he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969).

Standards and tests, both as to substance and procedure, which have been customarily applied in non-educational institution cases certainly have now come to apply to the college campus.

"The 'freedom of association' cases (see, e. g., N. A. A. C. P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); N. A. A. C. P. v. Alabama ex rel. Flowers, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964) do not provide an immediate solution, since they indicate that a student group may be required to prove a likelihood that chartering, membership registration and faculty sponsorship create a burden on free association which outweighs the institution's general interest in ensuring that organizations contribute to the academic environment."

Lucas, Comment, 45 Denver L.J. 622, 634 (1968).

Thus, by way of example, while a leader of the Ku Klux Klan may hold a rally for the purpose of " 'advocat(ing) * * * the duty, necessity or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform' " Brandenburg v. Ohio, 395 U.S. 444, 445, 89 S.Ct. 1827, 1828, 23 L.Ed.2d 430 (1969), it does not follow that a student group can gain university recognition, and the advantages which accompany such recognition, for such a purpose.

■ No student group is entitled, per se, to official college recognition. Rather, once a college allows student groups to organize and grants these groups recognition, with the attendant advantages, constitutional safeguards must operate in favor of all groups which apply. This requires adequate standards for recognition and the fair application of these standards. It is the procedural application of the existing college standards that is in issue here.

The petitioners' application for recognition was submitted to President James, with the recommendation of the Student Personnel Committee, an advisory committee, that it be granted. He denied it on the grounds that he found the aims of the National SDS to be contrary to the prevailing standards set to qualify for recognition at CCSC. If a college administrator of a public institution is free to go outside the group's application to make his own personal findings as to their purpose, and without the benefit of a minimal hearing, then any political group, no matter what its stated purpose, could be summarily denied recognition on the personal whim of the deciding authority.

■■ A student organization cannot be denied college recognition on the *ex parte* findings of the recognizing authority, where these findings have no basis in the organization's application

for recognition. Where ambiguity exists in such an application, and such ambiguity, if resolved against the applicants would result in their non-recognition, constitutional due process requires that a timely hearing be noticed and the petitioners be given at least an opportunity to be heard. If the college president does not have the time personally to devote to this kind of matter, as it is well understood he may not, he may delegate an agent to conduct an appropriate hearing. Upon the overall record, he would then make his findings as to whether or not the application met the existing policy standards of the college, which would qualify the applicant club for official campus recognition. The stipulation submitted to the Court contained no record of the contents of the minutes of the Student Personnel Committee; and there have been no exhibits entered to support any factual finding by that Committee relating to policy standards which were submitted to President James with the Committee's recommendation.

■ The ambiguity in this application is patent in that it states that the petitioners wish to become a "local" chapter of SDS. The term itself, "local chapter," strongly infers some kind of affiliation with a more extensive parent organization; yet the application specifically represents that the local group would not be under the dictates of the national organization. The college administration may wish to have this ambiguity clarified and the credibility of the representations ascertained and verified. The initial question might be whether or not a local unaffiliated chapter of SDS can lawfully exist without being subject to the dictates of the national organization. A copy of the organization's charter, by-laws or other similar type of document might be helpful on this point. In light of the recent fragmentation of the National SDS, it might also be relevant to know of which faction, if any, this group wishes to become a local chapter. Were it to be found to be impossible for a local chapter of SDS to exist without being affiliated with the national parent organization could the aims and philosophy of the latter group become relevant and important. These suggested areas of inquiry are in no way intended to restrict the scope of the college's hearing on this matter, but rather simply to point out areas of inquiry which might resolve the issue.

■ State law vests in the State College Board of Trustees responsibility for the adoption of policies governing the administration of Central Connecticut State College.[3] This power was delegated to President James as the agent of the Board with power to administer, maintain and supervise the orderly operation of the College educational program. Campus disciplinary controls must be the ultimate decision and responsibility of the President and the Board of Trustees. No court should interfere in reviewing the wisdom of any policy adopted, provided there is no invasion of constitutional due process of law, substantively or procedurally. It is not the business of the court nor is it within its prerogative to interfere with or attempt to administer college rules and regulations. To do so would invite administrative indecision and chaos.

Only where a serious substantive or procedural right is claimed to have been invaded should the court review an aggrieved petitioner's claim. In this case a constitutional issue has been raised by the plaintiffs, namely, that their rights of freedom of speech and freedom of association have been violated by what they claim has been the arbitrary refusal of the President to grant them recognition as an unaffiliated local chapter of the SDS.

■ It should be made crystal clear that this Court does not find the defendants lack authority to deny petitioners' application seeking official campus rec-

3. Conn.Gen.Stat. §§ 10–109, 10–109b.

ognition. On the contrary, if substantial evidence is offered at the hearing to the effect that the proposed club has among its aims and purposes, the philosophy of violent activism, then the college administration would have the lawful right to refuse approval of the new club and thus refrain from conferring upon it the status of official campus respectability. Where it is found that a club's objectives are designed to encourage and foster campus disruption and violence so as to frustrate and destroy the college's established educational policies, it is not only the lawful right of the college administration, but it is its duty to act with firmness and decision. No campus group operating under a false disguise while mouthing claim to pure motives, or pursuant to a constitutional claim of freedom of expression should ever be permitted to have administrative approval, where its clear objectives are designed to violate the personal or property rights of others by committing physical acts which are plainly wrongful. When the climate of civility in the academic community is once destroyed, the intellectual interchange of ideas ceases and academic freedom with its dispassionate search for truth is destroyed.

A hearing is hereby ordered to be held upon reasonable notice to the parties, which shall be conducted by President James, or a hearings officer duly designated by him and acting in his stead. All of the plaintiffs in this action shall be afforded an opportunity to be heard and shall be entitled to cross-examine witnesses; said hearing shall be conducted in a climate of respectful civility and record thereof made. Said hearing shall take place within thirty (30) days of this order. This Court shall retain jurisdiction of this action for the entry of such further orders or judgments by the Court as may be necessary and appropriate.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P. so ordered.