Larry BROOKS, Jan C. Pitsenberger, Joseph E. Sanders, Craig Lenhard, Dr. Hermione Shantz, Dr. John C. Frandsen, Dr. Wesley Newton, Charles D. Taylor, Plaintiffs,

v.

AUBURN UNIVERSITY, Harry M. Philpott, individually and as President of Auburn University, Frank P. Samford, Sr., Chairman, Board of Trustees, Auburn University, Defendants.

Civ. A. No. 791–E.

United States District Court
M. D. Alabama, E. D.

Feb. 5, 1969.

Morris S. Dees, Jr., Montgomery, Ala., for plaintiffs.

James J. Carter (Hill, Hill, Stovall & Carter), Montgomery, Ala., Thomas D. Samford, III, and William J. Samford (Samford & Samford), Opelika, Ala., for defendants.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

In this class action plaintiffs seek to have this Court issue a preliminary injunction restraining defendants from interfering with a scheduled speaking appearance at Auburn University of the Reverend William Sloan Coffin. Plaintiffs also seek a declaratory judgment of the unconstitutionality of certain regulations, rules, and guidelines concerning inviting speakers to the Auburn University campus. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1981, 1983.

This cause is now submitted on plaintiffs' motion for a preliminary injunction and the hearing held thereon in this Court on February 3, 1969.

Plaintiffs in this action are students and faculty members of Auburn University, and the Human Rights Forum, an officially chartered Auburn University student organization. Defendants are Auburn University, a state-operated institution of higher learning located at Auburn, Alabama, Dr. Harry M. Philpott, individually and as President of Auburn University, and Frank P. Samford, Sr., Chairman of the Board of Trustees of Auburn University.

The events immediately triggering this action commenced November 13, 1968, when the Chairman of the Human Rights Forum, David Jeffers, made a written request to the Public Affairs Seminar Board requesting $650 to pay the Reverend William Sloan Coffin to speak at the University on February 7, 1969. The Public Affairs Seminar Board was chartered by Auburn University for the purpose of "allocating funds to departments or groups for the presentation of seminars, conferences, individual lecturers, or other activities which encouraged the worthwhile discussion of public affairs." The Public Affairs Seminar Board met on November 20 and approved unanimously the Human Rights Forum's request. On November 21 the Public Affairs Seminar Board's chairman informed the Human Rights Forum in writing that its request had been approved.

On November 22 President Philpott told the Chairman of the Public Affairs Seminar Board that the Reverend Mr. Coffin would not be allowed to come to the Auburn University campus because he might advocate breaking the law and because he was a convicted felon. On November 25 President Philpott invited the Human Rights Forum Chairman, David Jeffers, to his office and at that time told Jeffers the invitation to the Reverend Mr. Coffin would have to be withdrawn. President Philpott then laid down what the plaintiffs have termed

"the oral Philpott rules" relative to inviting outside speakers. These rules consist of three provisions:

Student organizations could not invite (a) a speaker that could reasonably be expected to advocate breaking a law, (b) a speaker who had been previously convicted of a felony, and (c) a speaker of the type as the Reverend Mr. Coffin because it would be tantamount to Auburn University's sanctioning what the Reverend Mr. Coffin advocated.

On December 4 the Public Affairs Seminar Board met with President Philpott at his request. At this time President Philpott stated he was using his power as President to veto the expenditure of the money and was banning the appearance of the Reverend Mr. Coffin at Auburn University, and he again stated the "oral Philpott rules" upon which he based this action. At this meeting President Philpott handed out "Guidelines for Issuing Invitations to Outside Speakers." He stated these were for study and discussion only and were not being handed out as "rules." These guidelines are attached as Exhibit "A." The most relevant guideline for present purposes is guideline 2 which provides:

"Invitations to speak at Auburn University should not be extended to persons who by prior expression might reasonably be expected to advocate:

a. Disregard for the laws of our society or the breaking of these laws.

b. The violent overthrow of our government."

Several other background facts are worthy of note. The Reverend William Sloan Coffin is the active Chaplain of Yale University and has been an outspoken leader of the opposition to American involvement in the Vietnam war.

In connection with these activities, the Reverend Mr. Coffin has been arrested and has been convicted by a United States District Court in Massachusetts for conspiracy to counsel and aid and abet young men in resisting the draft. That conviction is currently on appeal. The Reverend Mr. Coffin has frequently lectured on college campuses in the last twelve months.

Prior to the invitation to the Reverend Mr. Coffin, Auburn University had no written or orally announced policy or guidelines for inviting speakers to the campus. In the last several years speakers have been invited, some at University expense, to speak to student and faculty groups on campus.[1] Among others, these speakers included Whitney Young, George C. Wallace, Admiral John Crommelin, and Lurleen B. Wallace.

President Philpott has made it clear that the fact that the funds of the Public Affairs Seminar Board were to be used to pay the Reverend Mr. Coffin was a significant consideration but was not critical to his decision. It also seems clear that the ban is not based upon the probability of violence, riots, or other disorders accompanying the proposed speech. It is also clear from Dr. Philpott's testimony that the scheduled appearance of the Reverend Mr. Coffin would not unduly interfere with the discipline or the orderly operation of Auburn University. In short, the basic reasons Dr. Philpott advances in support of his decision to ban the Reverend Mr. Coffin's appearance and payment therefor at Auburn University are based upon a "philosophical concept" and his decision in the matter constitutes a "philosophical decision."

Turning to the relevant legal background, it is not considered necessary or even appropriate to a disposition of the issues in this case to deal with or discuss the legal rights of the Reverend

1. Dr. Philpott testified in this case that a $10,000 fund—acquired from student fees—has been allocated by the University officials for use in obtaining and paying speakers invited through the same procedures used in the invitation extended to the Reverend Mr. Coffin to appear and lecture to students on the campus of Auburn University.

Mr. Coffin to speak at Auburn University without an invitation. Rather, this case involves the rights of students and faculty to hear a speaker invited to the campus by them according to the University's authorized procedures. The Supreme Court has recognized that hearers and readers have rights under the First Amendment. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). What is implicit in the majority opinion is made explicit in the concurring opinion of Justices Brennan and Goldberg:

"[T]he addressees assert First Amendment claims in their own right: they contend that the Government is powerless to interfere with the delivery of the material because the First Amendment 'necessarily protects the right to receive it.' * * *

"It is true that the First Amendment contains no specific guarantee of access to publications. However, the protection of the Bill of Rights goes beyond the specific guarantees to protect from congressional abridgment those equally fundamental personal rights necessary to make the express guarantees fully meaningful. * * * I think the right to receive publications is such a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren market place of ideas that had only sellers and no buyers." Lamont v. Postmaster General, supra, at 308, 85 S.Ct. at 1497. See also Snyder v. Board of Trustees of University of Illinois, 286 F.Supp. 927 (N.D.Ill. 1968).

 There can no longer be much doubt that constitutional freedoms must be respected in the relationships between students and faculty and their university. As this Court said in Dickey v. Alabama State Board of Education, 273 F.Supp. 613, 618 (M.D.Ala.1967):

"A state cannot force a college student to forfeit his constitutionally protected right of freedom of expression as a condition to his attending a state-supported institution."

In *Dickey*, this Court relied heavily upon the leading case of West Virginia State Board of Education v. Barnett, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 in which the Supreme Court stated:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

Auburn University is, of course, a state agency, and in terms of freedom of expression what is true of elementary and secondary education must be true *a fortiori* of colleges and universities. Indeed, it could be argued that an open forum is even more important on a campus than among the public generally. Chief Justice Warren seemed to be suggesting just that in Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957), when he stated:

"The essentiality of freedom in the community of American universities is almost self-evident. * * * Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

It is these considerations which have repeatedly led courts to strike down restrictions on First Amendment rights in this context. See e. g., Danskin v. San Diego Unified School Dist., 28 Cal. 2d 536, 171 P.2d 885 (1946); Buckley v. Meng, 35 Misc.2d 467, 230 N.Y.S.2d 924

(1962); Dickson v. Sitterson, 280 F. Supp. 486 (M.D.N.C.1968); Snyder v. Board of Trustees of University of Illinois, supra; Student Liberal Federation v. Louisiana State Univ. at New Orleans, Civil No. 68–300, E.D.La., Feb. 13, 1968; and Stacy v. Williams, Civil No. WC 6725, N.D.Miss., Jan. 20, 1969. See also Van Alstyne, The Judicial Trend Toward Student Academic Freedom, 20 U.Fla.L. Rev. 290 (1968).

Given that students and faculty are not second class citizens, one can turn to the many cases and scholarly articles from which emerge the nature and scope of their First Amendment rights.

The broad issue of whether Auburn might close its campus altogether to outside speakers is not raised in this case. Rather, we have a situation similar to that facing a New York court in which the observation was made:

> "The over-riding issue as to use of school facilities for non-academic purposes is not raised. Thus, while there may be no duty to open the doors of the school houses for uses other than academic—and I have some doubt even as to this proposition—once they are opened they must be opened under conditions consistent with constitutional principle." Buckley v. Meng, supra, 230 N.Y.S.2d at 933.

■ The principal constitutional provision involved in this case is, of course, the First Amendment, which provides:

> "Congress shall make no law * * abridging the freedom of speech * * or the right of the people peaceably to assemble."

In applying this provision to the actions of the federal and state governments, the basic task of the courts has been to demarcate the line between speech, the regulation of which is strictly limited by the First Amendment, and action, the regulation of which is permitted subject only to other constitutional provisions and legal doctrines. As a leading scholar has observed:

> "The line in many situations is clear. But at many points it becomes obscure. Expression often takes place in a context of action, or is closely linked with it, or is equivalent in its impact. In these mixed cases it is necessary to decide, however artificial the distinction may appear to be, whether the conduct is to be classified as one or the other." Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 917 (1963).

Thus, in some cases action will be treated as symbolic speech, and if speech is so abused as to intentionally incite violence and crime, that speech will be treated functionally as conduct and may be punished. The Supreme Court has recently had occasion to restate the principles involved in dealing with these abuses of freedom of speech:

> "We do not here challenge the principle that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guaranty of the First Amendment. In Cantwell v. Connecticut, 310 U.S. 296, at 308 [60 S.Ct. 900, at 905, 84 L.Ed. 1213] (1940), this Court said that '[n]o one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot.' * * * Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. · Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.

> "The Court has emphasized that '[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 [83 S.Ct. 631, 639, 9 L.Ed.2d 584] (1963); Freedman v. Maryland, 380 U.S. 51,

57 [85 S.Ct. 734, 738, 13 L.Ed.2d 649] (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. Maryland, supra, at 58 [85 S.Ct. at 739], a noncriminal process of prior restraints upon expression 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" Carroll v. President and Comm. of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

As indicated above, most direct regulations or prohibitions on speech are precluded by the First Amendment. As an aspect of this, the Supreme Court has struck down licensing and permit schemes which vest arbitrary powers of censorship in an administrative official. Thus, in Kunz v. New York, 340 U.S. 290, 293–294, 71 S.Ct. 312, 314–315, 95 L.Ed. 280, Chief Justice Vinson stated:

"We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights.

" * * * [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places."

■ In addition, there have been cases where a state legislature or Congress in furtherance of legitimate interests has promulgated regulations of unprotected conduct which do go, or threaten to go, too far and encroach upon protected speech. To deal with these situations the courts have fashioned the doctrines of "void for vagueness" and "over-

breadth." These doctrines, while not precluding regulation of the substantive evils, require that the regulations be drafted in language that will not deter by threat of regulation or punishment the exercise of protected speech. Although the linguistic vice with which each doctrine deals is different, the undesirable effect at which the doctrines are aimed is similar. Compare Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) with Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In both Dickson v. Sitterson, supra, and Snyder v. Board of Trustees of University of Illinois, supra, the doctrines of vagueness and overbreadth were used to strike down speaker bans on "subversives." In Stacy v. Williams, supra, a three-judge court used the doctrines to strike down a speaker ban on persons "charged with crimes."

■ The above discussion should not be taken as indicating that regulations of "speech" are absolutely prohibited. As Professor Van Alstyne has suggested, colleges may provide for reasonable regulation of the time, place, or manner of the speech. Broadly speaking, these are restrictions that go to the form of the speech rather than to the substance. Thus, an institution might provide for procedures permitting an orderly scheduling of facilities, and it might preclude conflicts with academic events.

■ Finally, even where this limited regulation is permitted and where the regulations are drawn in clear, narrow terms, the regulations may not be used to deny either the speakers or the listeners equal protection of the laws by discriminating among speakers according to the orthodoxy or popularity of their political or social views. See Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267 (1951); Bynum v. Schiro, 219 F.Supp. 204 (E.D.La.1963).

A useful summary on the rights of students to invite and to hear speakers on campus is provided in Van Alstyne,

The Judicial Trend Toward Student Academic Freedom, supra, at 301–02.

"The courts have come to recognize that an individual cannot be made to relinquish those rights which he holds as a citizen (including the right to hear) as a condition of attending college. The college may generally regulate the appearance of invited guest speakers only to an equivalent extent as may a civil polity regulate public facilities that are otherwise suitable as meeting places. It may establish neutral priorities (for example giving preference to a regular academic event over an invitation to a guest speaker sought to be scheduled for the same time). It may require that sponsoring organizations submit sufficient information to enable university officials an orderly means of allocating facilities. It may oblige the speaker to assume full responsibility for any violation of law involved in his own conduct. It probably may require a statement that the views presented are not necessarily those of the institution or of the sponsoring group. But it may neither proceed by rules that are vague or that reserve unchecked discretion to censor, nor may it screen speakers according to their political affiliation, their subject matter, or their point of view."

■ Having stated the governing principles, one must turn to the occasionally more difficult problem of applying them to a concrete situation. Among other things, plaintiffs contend that Auburn's rules are vague and overbroad. Certainly they are that. In barring anyone who "advocates" breaking of the laws, the regulations run afoul of the almost constitutional ambiguity of "advocate." See Yates v. United States, 354 U.S. 298, 318–319, 324–325, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Broadly speaking, *Yates* says advocating disobedience of the law in the abstract is constitutionally protected speech; incitement to illegal action is not.

There have been some situations in which the Supreme Court has recognized a right to counsel disobedience of the law. In Keegan v. United States, 325 U.S. 478, 494, 65 S.Ct. 1203, 1209, 89 L.Ed. 1745 (1945), a member of the German-American Bund advocated refusal of military service as a means of protesting a congressional enactment that disqualified Bund members for certain jobs. Keegan asserted that the law unjustly discriminated against American citizens and that therefore they were not bound by the Selective Service Act. In holding that an acquittal should have been directed as requested, the Court stated:

"One with innocent motives, who honestly believes a law is unconstitutional and, therefore, not obligatory, may well counsel that the law shall not be obeyed * * *."

The same principle was applied in Okamoto v. United States, 152 F.2d 905 (10th Cir. 1945), when Japanese-Americans who had been evacuated from west coast cities and placed in internment camps decided they were not subject to Selective Service while so confined.

■ In barring all speakers convicted of a felony, the regulations run afoul of the ambiguity of "convicted." In most instances lawyers would use "convicted" to refer to a final conviction after all appeals had been exhausted. The meaning must be unclear, however, since here President Philpott has applied it to a speaker whose conviction is still on appeal. The defendants as justification for banning the appearance and lecture of the Reverend Mr. Coffin place considerable emphasis upon the fact that he has been "convicted of a felony." As a matter of fact, this is the primary justification for the invocation of the regulations by Dr. Philpott, the effect of which bars the Reverend Mr. Coffin from appearing and speaking and consequently deprives these plaintiffs of the opportunity to hear and weigh what the Reverend Mr. Coffin may have to say. As stated earlier, the Reverend Mr. Coffin has been "convicted" of a felony in a United States District Court in Massachusetts. This con-

viction is presently on appeal, and although there is no testimony on this particular point it is common knowledge that the matter will be, if necessary, litigated through the courts, including the Supreme Court of the United States. This Court is of the opinion that the present status of the criminal prosecution against the Reverend Mr. Coffin cannot be used as a justification for the regulations in question. As a matter of fact, the Honorable Thomas S. Lawson, then Attorney General for the State of Alabama and presently a member of the Supreme Court of Alabama, in an opinion rendered in 1940, 18 Quarterly Report of the Attorney General of Alabama 120 (1940), stated:

"A party would not be disqualified from voting who had been convicted of crime which would disqualify while his case is pending in the appellate courts as this disqualification does not attach until the case is finally disposed of and the judgment of the court of last resort has affirmed the conviction had in the trial court."

That part of the regulation which would bar speakers whose views Auburn could not sanction also sweeps overbroadly, although it is difficult for this Court to see why a university administration should be thought to have the authority to approve the ideas of a campus speaker as a condition to the speaker's appearance at the invitation of students and faculty. If this is a legitimate concern, it can be dealt with in ways other than totally barring the speaker.

The vice in these regulations, however, is really far more basic than their just being vague and overbroad. *These regulations of Dr. Philpott are not regulations of conduct at all.* That would presuppose that they dealt with activities which the state had a legitimate interest in restricting. No such interest has been suggested here. Rather, we have here direct regulation of speech, regulations which on their face restrict the nature and source—both the medium and the message—to which

these student and faculty plaintiffs may be exposed. In plain words these regulations must fall because they constitute blatant political censorship. As Justice Black declared in a similar case, Cox v. Louisiana, 379 U.S. 559, 581, 85 S.Ct. 466, 470, 13 L.Ed.2d 487 (1965) (concurring opinion):

"I have no doubt about the general power of Louisiana to bar all picketing on its streets and highways. * * * But by specifically permitting picketing for the publication of labor union views, Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments."

The State of Alabama cannot, through its President of Auburn University, regulate the content of the ideas students may hear. To do so is illegal and thus unconstitutional censorship in its rawest form. In reaching this conclusion upon the facts in this case, this Court makes no new law and advances no novel constitutional concepts to support its decision. The cases on similiar questions are practically unanimous in holding and declaring that such action as attempted by President Philpott in this case is unconstitutional censorship in violation of the First Amendment. Only last month Judges James P. Coleman, Dan M. Russell, Jr., and William C. Keady, sitting as the United States District Court for the Northern District of Mississippi, declared unconstitutional a speaker's regulation adopted by a State of Mississippi organ—Board of Trustees of Institutions of Higher Learning. In declaring the Mississippi regulations unconstitutional, the Court stated that the regulations—quite similar to the ones relied upon by the defendants in this case—were unconstitutionally vague and overbroad. Stacy v. Williams, supra.

Defendants contend that the alleged vices in the "oral Philpott rules" and the proposed guidelines are not the real issues in this case. Indeed, President Philpott states that he does not regard the restrictions against those convicted of crimes or those who advocate breaking the law as rules to be applied rigidly. Rather, he insists that because Alabama law places upon him the final responsibility for allocating University funds, he as President has the inherent power to determine in his discretion and on a case-by-case basis who shall be invited to speak on the Auburn campus.

 There is no doubt that the powers and responsibilities of a university president are awesome and extensive. Those powers include wide discretion in dealing with allocating funds, with educational policy, with the requirements of campus order and discipline, and with the time, place, and manner of extracurricular lectures. This Court will not ordinarily sit to review the wisdom with which that discretion is exercised.

 It is the duty of this Court, however, to review the exercise of governmental power where there is a tenable claim that it has been exercised in a manner inconsistent with the Constitution of the United States. The point which defendants have forgotten, as persons in authority are wont to forget, is that the First and Fourteenth Amendments are *limitations on governmental power*. They were intended to have and do have the force of law. If Acts of Congress, state statutes, or administrative actions conflict with these limitations, they must yield; the Constitution is the supreme law of the land.

 Thus, while it can be said that President Philpott has the ultimate power to determine whether a speaker is invited to the campus, the First Amendment right to hear of the students and faculty of Auburn University means that this determination may not be made for the wrong reasons or for no reason at all.

 Their vagueness and overbreadth aside, the stated reasons will not pass muster. There is no relationship between a speaker's criminal conviction—especially one on appeal—and the value of his words to the listener. Advocating disobedience of the law may or may not be constitutionally protected. If it is not and constitutes a violation of law, the speaker subsequently can be punished. The speech may not be restrained in advance except when there is a clear and unmistakable determination that the speaker will violate the law in the course of the speech. Such a determination can only be made if adequate procedures are adopted. No such determination was made here.

 If the banning of the right to hear this speaker be seen as independent of the stated reasons, as indicated by the testimony to the effect that Dr. Philpott had not seen fit to apply these reasons to those who fit within the loose criteria as well as the Reverend Mr. Coffin, it must fall because it becomes the act of an unbridled censor. The arbitrary acts of a censor cannot be tolerated; not because arbitrary power will be abused in every case but because of its inherent potential for discrimination against unorthodox views. For example, arbitrary power in the administration would permit discrimination against speakers who it was felt would be unpopular with a state legislature. Although this Court accepts Dr. Philpott's testimony that such considerations did not influence his decision in this case, the evidence indicates that officials who would be in a position to influence that decision expressed concerns that the Alabama legislature might react to an invitation to the Reverend Mr. Coffin by cutting the University's appropriation or by enacting a Speaker Ban Law. Such concerns, if acted upon, could broadly stifle the right to hear.

The prohibition on arbitrary or discriminatory action also relates to President Philpott's power to control the use of University facilities and funds where

that control affects the right to listen. In this case it is clear that the University authorities allocated $10,000 from student fees to be used to pay speakers invited to campus by student organizations. The Public Affairs Seminar Board was established to provide at least initial approval of requests, Dr. Philpott reserving final authority. But, as Dr. Philpott stated, he has never vetoed or questioned the invitation of any speaker, or even made it his business to determine who was speaking in University facilities prior to the proposal to invite the Reverend Mr. Coffin.

■ As President Philpott's testimony made clear, the fact that Coffin was to be paid from University funds was not crucial to his decision. Neither is it crucial here. This Court neither thinks nor holds that Auburn was required to allocate funds from student fees or from public monies to pay invited speakers. Having allocated the money, however, and having paid other speakers with no questions asked, Auburn may not in this instance, for no constitutionally acceptable reason, withhold the funds for the Reverend Mr. Coffin as a censorship device.

■ Nor may Auburn withhold available facilities. While Auburn may establish neutral priorities and require adequate coordination, this Court is clear to the conclusion that it cannot altogether close its available facilities to outside speakers. But here there is no claim that space would not be available, and it is clear that facilities have always been available to speakers invited by student groups. Suitable space must be provided the Reverend Mr. Coffin too.

In the oft quoted words of Judge Learned Hand:

"It [the First Amendment] presupposes that right conclusions are more likely to be gathered out of a multi-

tude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

This Court is aware of the many forces which tend to foster the fear that the First Amendment is "folly." The paranoia of living under a nuclear balance of terror, the divisiveness of an unpopular war, the racial tensions existing throughout the country, the economic and social deterioration of our inner cities, and the insecurity of unprecedented technological change are but a few of the forces which continue to threaten our constitutional form of government. If our First Amendment's freedom to speak and freedom to listen are unduly infringed, our plan of self-government is seriously weakened.

■ The evidence in this case does not reflect any reason for the disruption of the academic functions and mission of Auburn University by reason of the appearance and lecture of the Reverend William Sloan Coffin. This Court in making this finding and conclusion is acutely aware of the "delicate and highly discretionary functions" of the University's administrators. However, in this instance these functions must be performed within basic constitutional limitations. Conflicting points of view on sensitive current topics must be—where people want to hear them—afforded a forum. The denial of the right to hear these conflicting views—even though those in authority believe them to be unwise or un-American—violates the very ideas of our government. As Alexander Meikeljohn [2] wrote:

"When men govern themselves, it is they—and no one else—who must pass judgment upon unwisdom and unfairness and danger. And that means

2. Noted educator, author and philosopher, whose writings are often quoted on First Amendment rights. See, e. g., Justice William J. Brennan, Jr., The Supreme Court and the Meiklejohn Interpretation

of the First Amendment, 79 Harv.L.Rev. 1 (1965). This quote was taken from Emerson, Haber, Dorsen, Political and Civil Rights in the United States 13 (Student ed. 1967).

that unwise ideas must have a hearing as well as wise ones, unfair as well as fair, dangerous as well as safe, un-American as well as American. * * "

The denial of that right to hear:

" * * * is that mutilation of the thinking process of the community against which the First Amendment to the Constitution is directed."

An order will be entered accordingly.

### EXHIBIT "A"
### GUIDELINES FOR ISSUING INVITATIONS TO OUTSIDE SPEAKERS

Auburn University proclaims as its first purpose to maintain a community of learning where knowledge may be preserved, disseminated and increased. It recognizes that freedom of discussion and investigation is essential for the fulfillment of this purpose and seeks to provide the maximum freedom for all members of the academic community.

Auburn University also recognizes that a society or institution cannot exist without restraints upon the liberty of individuals within these units. The educational nature of the University requires limitations on individual freedom if educational objectives are to be achieved. The University believes that the rule of law, even though it may limit individual liberty, is essential for the maintenance of freedom in our society and for the continued existence of our society itself. As a state institution, supported in part by tax funds, it has the further responsibility to uphold the laws of the political institutions which make possible its existence.

In the presentation of outside speakers on the campus, the following guidelines will be followed:

1. Speakers should be selected on the basis of their contribution to the educational objectives of the institution and possess the intellectual and other qualifications appropriate for speaking in an institution of higher learning.

2. Invitations to speak at Auburn University should not be extended to persons who by prior expression might reasonably be expected to advocate:

 a. Disregard for the laws of our society or the breaking of these laws.

 b. The violent overthrow of our government.

3. Dissent and controversy are necessary elements in a democratic society. The University will encourage the free discussion and presentation of controversial issues. In line with its educational purposes, every effort should be made to present fairly opposing viewpoints on controversial issues and to avoid the appearance of partisanship in such matters.