Jon **EISNER** et al., **Plaintiffs,**

v.

The **STAMFORD BOARD OF EDUCA-TION** et al., **Defendants.**

Civ. No. 13220.

United States District Court, D. Connecticut.

July 2, 1970.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

The parties' cross motions for summary judgment present the question whether a student newspaper may be distributed in a public high school without the necessity of it being submitted to the school administration for prior approval of its contents.

### I.

The pertinent facts are undisputed. The plaintiffs, students at Rippowam High School, a public high school in Stamford, Connecticut, are authors and publishers of an independent mimeographed newspaper entitled the "Stamford Free Press." The newspaper is printed at the students' expense and expresses their views upon current controversial subjects. Three issues of the newspaper were distributed beyond school limits without incident. After there was an attempt to circulate a fourth issue on school grounds, school officials, named defendants herein, warned the students they would be suspended if the activity continued. In existence at the time was a regulation passed by the Board of Education which prohibited "using pupils for communications." When negotiations between the students and administration failed to resolve the dispute, this suit was instituted on June 23, 1969.

Thereafter, on November 18, 1969, the Board of Education restated its policy on the matter with the following enactment:

### Distribution of Printed or Written Matter

The Board of Education desires to encourage freedom of expression and creativity by its students subject to the following limitations:

> No person shall distribute any printed or written matter on the grounds of any school or in any school building unless the distribution of such material shall have prior approval by the school administration.

Monroe Silverman, Wofsey, Rosen, Kweskin & Kuriansky, Stamford, Conn., for plaintiffs.

Frederick L. Comley, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendants.

In granting or denying approval, the following guidelines shall apply:

> No material shall be distributed which, either by its content or by the manner of distribution itself, will interfere with the proper and orderly operation and discipline of the school, will cause violence or disorder, or will constitute an invasion of the rights of others.

The plaintiffs contend this regulation contravenes the guarantee of freedom of speech and press under the First Amendment. The defendants, on the other hand, argue that the regulation is a valid exercise of the Board's inherent power to impose prior restraints on the conduct of schoolchildren.

## II.

At the outset it is important to stress what is not contested in this lawsuit. The plaintiffs acknowledge that the school authorities may, and indeed must at times, control the conduct of students. To this end the administration has the power and the duty to promulgate rules and the appropriate guidelines for their application. More specifically with respect to this case, the plaintiffs concede the defendants possess the authority to establish reasonable regulations concerning the time, exact place in the school, and the manner of distribution of the newspaper, and to insist that each article identify its author.

Moreover, the plaintiffs do not challenge the Board's power to issue guidelines on the permissible content of the newspaper. For example, they do not object to a prohibition of obscene or libelous material. They further recognize that the Board has the duty to punish "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others * * *." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S. Ct. 733, 740, 21 L.Ed.2d 731 (1969).

The only issue before the Court concerns the constitutional validity of the requirement that the *content* of. the literature be submitted to school officials for approval prior to distribution.

## III.

Viewing the regulation in question solely on its face, it seems clear to the Court that the regulation is a classic example of prior restraint of speech and press which constitutes a violation of the First Amendment. In Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S. Ct. 625, 75 L.Ed. 1357 (1931), the Supreme Court stated:

> The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England, directed against the legislative power of the licenser, resulted in renunciation of the censorship of the press. The liberty deemed to be established was thus described by Blackstone: "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity." * * * The distinction was early pointed out between the extent of the freedom with respect to censorship under our constitutional system and that enjoyed in England. Here, as Madison said, "the great and essential rights of the people are secured

against legislative as well as against executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the freedom of the press, requires that it should be exempt not only from previous restraint by the Executive, as in Great Britain, but from legislative restraint also." * * * This Court said, in Patterson v. Colorado [ex rel. Attorney General], 205 U.S. 454, 462 [27 S.Ct. 556, 558, 51 L.Ed. 879]: "In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous restraints* upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. * * *" 283 U.S. at 713–714, 51 S.Ct. at 630.

The Court then further confirmed that: "* * * [L]iberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship." *Id.* at 716, 51 S.Ct. at 631. See also Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Although no case precisely on point has been found, several recent rulings give strong support to this Court's opinion. In Antonelli v. Hammond, 308 F. Supp. 1329 (D.Mass. February 5, 1970), Judge Garrity in a reasoned opinion held that the prior submission to a faculty advisory board of material intended to be published in the student newspaper of a state college cannot be constitutionally required. In Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969), a summary judgment was granted enjoining a high school principal from interfering with the right of students to place advertisements of their political views on the Vietnam conflict in the school newspaper. And in Brooks v. Auburn University, 296 F.Supp. 188 (M.D.Ala.1969), the court observed, at 196, that: "* * * [t]he State of Alabama cannot, through the President of Auburn University,

regulate the content of the ideas students may hear. To do so is illegal and thus unconstitutional censorship in its rawest form." See also Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (S.D.Tex.1969).

## IV.

 The right of students to freedom of expression, however, is not absolute. The "heavy presumption" against restrictive regulations on free speech and press, Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L. Ed.2d 584 (1963), may be overcome "in carefully restricted circumstances." Tinker v. Des Moines Independent Community School District, supra, 393 U.S. at 513, 89 S.Ct. 733. School administrations of necessity must have wide latitude in formulating rules and guidelines to govern student conduct within the school. If there is "a specific showing of constitutionally valid reasons to regulate their speech," *Id.* at 511, 89 S.Ct. at 739, students must conform to reasonable regulations which intrude on that freedom. Free speech is subject to reasonable restrictions as to time, place, manner and duration. *Id.* at 512–513, 89 S.Ct. 733. See also Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed. 2d 471 (1965).

 In the present case, the defendants have not produced a scintilla of proof which would justify the infringement of the students' constitutional rights to be free of prior restraint in their writings. The contents of the issues of the "Stamford Free Press" submitted to the Court are infinitely less objectionable than the underground newspaper "Grass High," involved in Scoville v. Board of Education, etc., 425 F.2d 10 (7 Cir.1970), and the personal conduct and attitude of the plaintiffs herein have been commendable.

Moreover, even assuming the defendants carried their burden and demonstrated the necessity for prior restraint, the regulations provide none of the pro-

cedural safeguards designed to obviate the dangers of a censorship system. Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Cf. Powe v. Miles, 407 F.2d 73, 84 (2 Cir.1968). Among other things, the regulations do not specify the manner of submission, the exact party to whom the material must be submitted, the time within which a decision must be rendered; nor do they provide for an adversary proceeding of any type or for a right of appeal.

### V.

Finally, the Court is convinced that reasonable regulations can be devised to prevent disturbances and distractions in Rippowam High School and at the same time protect the rights of the plaintiffs to express their views through their newspaper. The Board of Education has the duty under Connecticut law, and the right under *Tinker*, to punish "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740. But this right and duty does not include blanket prior restraint; the risk taken if a few abuse their First Amendment rights of free speech and press is outweighed by the far greater risk run by suppressing free speech and press among the young. Cf. Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The remedy for today's alienation and disorder among the young is not less but more free expression of ideas. In part, the First Amendment acts as a "safety valve" and tends to decrease the resort to violence by frustrated citizens. See Whitney v. California, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); Abrams v. United States, 250 U.S. 616, 630, 40 S. Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); Emerson, Toward a General Theory of the First Amendment 11–15 (1967). Student newspapers are valuable educational tools, and also serve to aid school administrators by providing them with an insight into student thinking and student problems. They are valuable peaceful channels of student protest which should be encouraged, not suppressed.

Accordingly, for the reasons stated, the Court hereby grants plaintiffs' motion for summary judgment.