**George Ivey MOORE III, Plaintiff,**

**v.**

**GASTON COUNTY BOARD OF EDU-CATION et al., Defendants.**

**Civ. No. 3001.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 7, 1973.

George S. Daly, Jr., Charlotte, N. C., for plaintiff.

James B. Garland, Gastonia, N. C., and Willis C. Smith, Belmont, N. C., for defendants.

McMILLAN, District Judge.

George Ivey Moore III, plaintiff, brought this suit for injunctive and other relief, based upon his discharge from his position as a student teacher in the Gaston County, North Carolina, schools, because he gave unorthodox answers to student questions (derived from the day's lesson text) about creation, evolution, immortality, and the nature and existence of God.

Plaintiff is a 1970 graduate of the University of North Carolina at Chapel Hill. He enrolled at the University of North Carolina at Charlotte, seeking a master's degree and an "A" teaching certificate. For his "A" certificate he was required to do several months of practice teaching. This practice teaching, beginning in September 1971, was arranged for him by the University and the Gaston County school authorities, under the supervision of William T. Mauney, a teacher at the Highland Junior High School in Gaston County, North Carolina.

Up until November 10, 1971, his performance had been unremarkable; he maintained good control over his classes; he had done a lot of "practice" teaching, which was usually, in fact, substitute teaching, operating completely on his own.

On November 10, 1971, Moore was asked by the school principal, Mr. Wells, to substitute for a seventh grade teacher named Biggers. Moore conducted all of Biggers' classes without incident until the 1:05 P.M. class in the history of Africa, Asia and the Middle East.

No one had told Moore what the lesson assignment was for the day. When the class opened Moore asked the students, and after several minutes learned that the lesson assignment was pages 77 through 84 of the prescribed text. The title of the text was "THE MIDDLE EAST—A FLOWERING OF RELI-

GION." After several minutes of preliminary questioning it became apparent that the members of the class were not ready to recite. Moore thereupon directed the students to take fifteen minutes to read the seven-page lesson. After the reading period had passed, Moore attempted to get a discussion going on the subject of the lesson text, but with small success. His request for recitals on Judaism, Mohammedanism and the Hebrews produced little results. Some members of the class did give definitions of polytheism and monotheism. They were unable to say, as the text indicated, that Christianity and Judaism are both monotheistic religions.

On page 78 of the text appear the sentences:

"The Hebrews gave to all mankind a written record of how the belief in special tribal gods changed gradually to the belief in one God. We know this record as the Old Testament."

Moore, pursuing the lesson text, referred to the evolution of Hebraic beliefs from polytheism (belief in many gods) to monotheism (belief in one God).

The word "evolution" apparently struck a nerve. A student asked if Moore believed that man descended from monkeys; Moore responded that Darwin's theory of the origin of the species and the evolution of life from one form to another is a valid theory. He was asked if he believed Adam and Eve were the first people; he responded that as he saw it they were generic or symbolic rather than literally the first people. A discussion ensued whether the Bible in whole or in part was to be taken literally; Moore thought some of it should not be taken literally. In response to questions from the class Moore, apparently an agnostic, responded with answers that he did not attend church; did not know what a soul was; did not believe in life after death, nor in heaven nor hell. In the discussion of the Gospels (Matthew, Mark, Luke and John) and their divine inspiration he appears to

have suggested that a fifth gospel might yet be written by one divinely inspired, for example, by George Ivey Moore. In response to questions about the Bible, Moore referred to the Bible as a series of inspired writings which record the history, traditions, beliefs and practices of the ancient Hebrews.

None of these statements, according to Moore and the children who testified, was made by Moore except in answer to specific questions from the members of the class. He was responding to an extended cross-examination which started when, in following the lesson text, he undertook to discuss how the belief in numerous tribal gods evolved ("changed gradually") into belief in one God.

Some members of the class got excited. One or two members near the end of the period got up to leave, and were instructed by Moore to sit down. There was no physical disruption. Various students were displeased. The class was dismissed three or four minutes before the customary time for the class to end. They trooped back to the home room and talked to Mr. Mauney, their home room teacher, about the experience.

That evening the superintendent of schools, Mr. William H. Brown, received some telephone calls from irate parents —at his dinner time!

The next morning Mr. Brown talked with Mr. Wells, the principal, with Lee Phoenix, assistant superintendent for secondary education in the county schools, and with Robert Falls of the personnel office. Phoenix and Falls then talked with Moore. They apparently did not seek any understanding of what had happened, but simply asked Moore whether in fact he had or had not made the unorthodox statements that he did not believe in God nor in life after death. His response, in the traditional Christian funeral phrases, was "Ashes to ashes, dust to dust." Moore also told Phoenix that he could neither prove nor disprove the existence of a Supreme Being.

The following day, November 12, Mr. Brown, the school superintendent; Mr. Falls, the director of personnel; and Mr. Phoenix, the assistant superintendent, met early and decided that Moore had to go. They did not, before reaching this decision, talk with anybody who had been in the classroom other than Moore, and their conversation with Moore seems to have been confined simply to finding out whether he had, in fact, made the statements about which they had specifically inquired!

When the case was heard in this court, certain additional reasons were advanced for Moore's discharge, including "giving his own religion rather than reading the text"; talking Darwin to a "captive audience"; failing to observe a minimum "standard of rapport" with the students, which was inferred from the fact that the students were offended; attacking the fundamental Christian beliefs of the students. It was said that the class's reaction of wanting to leave because they thought he had ridiculed their religion showed that he should be discharged. (Moore was not asked in fact whether he had ridiculed their religion.)

Phoenix's criterion appears to have been that discussion of such matters was taboo because it was done in such an unaccustomed manner that it upset the class; the inference fairly arises that if his responses had conformed to locally accepted dogma, he would not have been discharged.

Moore, over the objections of the principal of the school, was relieved of his practice and substitute teaching duties. The University of North Carolina at Charlotte was requested to place him elsewhere. He did not, in fact, complete his practice teaching. Apparently, however, he was given full credit for his practice teaching towards his graduate degree because of his satisfactory work up to November 10, and because there were only a few weeks of practice teaching left to do.

North Carolina General Statutes § 115–160.6 provides that:

"A student teacher under the supervision of a certified teacher or principal shall have the protection of the laws accorded the certified teacher."

On the day in question Moore was a student teacher and as such student teacher was serving, without pay, as a substitute for Mr. Biggers and was under the supervision of Mr. Wells, the principal.

No instructions, specific or general, had been given to the plaintiff with regard to how he should teach the particular lesson nor as to whether he should answer or evade honest questions from the children.

Some of the constitutional principles which apply in this situation were set out by the court in Parducci v. Rutland, 316 F.Supp. 352 (N.D.Ala.1970):

That teachers are entitled to First Amendment freedoms is an issue no longer in dispute. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); see Pickering v. Board of Education, etc., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Pred v. Board of Public Instruction, etc., 415 F.2d 851, 855 (5th Cir. 1969). These constitutional protections are unaffected by the presence or absence of tenure under state law. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968); Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967).

Although academic freedom is not one of the enumerated rights of the First Amendment, the Supreme Court has on numerous occasions emphasized that the right to teach, to inquire, to evaluate

and to study is fundamental to a democratic society.[3] In holding a New York

3. See e. g., Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

loyalty oath statute unconstitutionally vague, the Court stressed the need to expose students to a robust exchange of ideas in the classroom:

Our nation is deeply committed to safeguarding academic freedom, which is of transcendant value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. * * * The classroom is peculiarly the "marketplace of ideas."[4]

4. Keyishian v. Board of Regents, etc., 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). Cf. Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Furthermore, the safeguards of the First Amendment will quickly be brought into play to protect the right of academic freedom because any unwarranted invasion of this right will tend to have a chilling effect on the exercise of the right by other teachers. Cf. Wieman v. Updegraff, 344 U.S. at 194, 195, 73 S.Ct. 215 (Frankfurter, J., concurring); Pickering v. Board of Education, etc., supra 391 U.S. at 574, 88 S.Ct. 1731.

The right to academic freedom, however, like all other constitutional rights, is not absolute and must be balanced against the competing interests of society. This Court is keenly aware of the state's vital interest in protecting the impressionable minds of its young people from any form of extreme propagandism in the classroom.

A teacher works in a sensitive area in a schoolroom. There he shapes the attitudes of young minds towards the society in which they live. In this, the state has a vital concern.[5]

5. Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960).

While the balancing of these interests will necessarily depend on the particular facts before the Court, certain guidelines in this area were provided by the Supreme Court in Tinker v. Des Moines Independent Community School District, supra. The Court there observed that in order for the state to restrict the First Amendment right of a student, it must first demonstrate that:

[T]he forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school". [Emphasis added.][6]

6. 393 U.S. at 509, 89 S.Ct. at 738, quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966).

The Court was, however, quick to caution the student that:

[Any] conduct * * * in class or out of it, which for any reason— whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.[7]

7. 393 U.S. at 513, 89 S.Ct. at 740; see Pred v. Board of Public Instruction, etc., supra, 415 F.2d at 859.

Our laws in this country have long recognized that no person should be punished for conduct unless such conduct has been proscribed in clear and precise terms. See Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). When the conduct being punished involves First Amendment rights, as is the case here, the standards for judging permissible vagueness will be even more strictly applied.[12]

12. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Winters v. New York, 333 U.S. 507, 509–510, 68 S.Ct. 665, 92 L.Ed. 840 (1948); see Brooks v. Auburn University, 296 F.Supp. 188 (M.D.Ala.), aff'd, 412 F.2d 1171 (5th Cir. 1969).

In the case now before the Court, we are concerned not merely with vague

standards, but with the total absence of standards. When a teacher is forced to speculate as to what conduct is permissible and what conduct is proscribed, he is apt to be overly cautious and reserved in the classroom.[13] Such a reluctance on

13. Cf. Keyishian v. Board of Regents, etc., *supra*, 385 U.S. at 604, 87 S.Ct. 675.

the part of the teacher to investigate and experiment with new and different ideas is anathema to the entire concept of academic freedom.

This Court is well aware of the fact that "school officials should be given wide discretion in administering their schools" and that "courts should be reluctant to interfere with or place limits on that discretion." Such legal platitudes should not, however, be allowed to become euphemisms for "infringement upon" and "deprivations of" constitutional rights. However wide the discretion of school officials, such discretion cannot be exercised so as to arbitrarily deprive teachers of their First Amendment rights. See Johnson v. Branch, *supra*, 364 F.2d at 180. This Court cannot, on the facts of this case, find any substantial interest of the schools to be served by giving defendants unfettered discretion to decide how the First Amendment rights of teachers are to be exercised. Cf. Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951).

In Mailloux v. Kiley, 323 F.Supp. 1387 (D.Mass.1971) (teacher discharged for writing taboo sex word on the blackboard and asking students to define it), Judge Wyzanski ruled that although a state had the power to suspend or discharge a teacher for using a teaching method not generally accepted in the profession, nevertheless:

". . . *it may not resort to such drastic sanctions unless the state proves he was put on notice either by a regulation or otherwise that he should not use that method.* This exclusively procedural protection is afforded to a teacher not because he is a state employee, or because he is a citizen, but because *in his teaching capacity he is engaged in the exercise of what may plausibly be considered 'vital First Amendment rights.'* Keyishian v. Board of Regents, 385 U.S. 489, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629. *In his teaching capacity he is not required to 'guess what conduct or utterance may lose him his position.'* (*Ibid*). If he did not have the right to be warned before he was discharged, he might be more timid than it is in the public interest that he should be, and he might steer away from reasonable methods with which it is in the public interest to experiment. *Ibid.*" *Mailloux*, at 1392. (Emphasis added.)

Plaintiff was entitled under North Carolina General Statutes § 115-160.6 (cited above) to the same "protection of the laws" as a certified teacher. The University and the Gaston school authorities had duly agreed that he have a term of practice teaching at the school in question. He had the reasonable expectation that this opportunity for practice teaching would continue until the end of the fall term as required by his University curriculum. The fact that he was not being paid is neither material nor controlling. Even if he had no right to compensation nor to permanent tenure he nevertheless had the right *not to be relieved of his teaching opportunity for unconstitutional reasons,* and he had the right to a fair hearing under due process safeguards, before being discharged. A hearing with just twenty minutes' notice before a hostile *ad hoc* committee without eyewitness testimony where the factual inquiry was confined to brief questioning concerning a few "unorthodox" statements can hardly pretend to comport with due process. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed. 548 (1972); Connell v. Higginbotham, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970); Johnson v. Fraley, et al., 470 F.

2d 179 (4th Cir., 1972). Both the equal protection and the due process guarantees of the Fourteenth Amendment were violated by the action of the defendants.

As to the teaching of Darwin, it had once been thought that the "monkey trial" in Dayton, Tennessee, might have marked the last effort to suppress discussion of evolution; but as late as 1968 the Supreme Court in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L. Ed.2d 228 (1968), was called upon to invalidate a state statute forbidding the teaching of evolution in the public schools, and upheld the lower court who restrained the school authorities from discharging the teacher. In the opinion the Court said:

"There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson*, at 106, 89 S.Ct. at 271.

"Arkansas' law cannot be defended as an act of religious neutrality. Arkansas did not seek to excise from the curricula of its schools and universities all discussion of the origin of man. The law's effort was confined to an attempt to blot out a particular theory because of its supposed conflict with the Biblical account, literally read. Plainly, the law is contrary to the mandate of the First, and in violation of the Fourteenth Amendment to the Constitution." *Epperson*, at 109, 89 S.Ct. at 273.

In Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court observed (at p. 603, 87 S.Ct. at p. 683):

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."

The First Amendment, which protects free speech, also provides for religious freedom:

"Congress shall make no law respecting establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press . . . ."

Religious or scientific dogma supported by the power of the state has historically brought threat to liberty, and often death to the unorthodox. Jesus Christ himself was such a victim. History is filled with the names of individuals who were punished or burned, not for atheism nor for lack of religion, but because their particular form of Christianity did not accord with the precise convolutions and procrustean conventions of the reigning spiritual powers. The Inquisitions, especially in Italy and Spain, are long-standing illustrations of this bloody and arbitrary tendency of mankind. At the height of the Italian Renaissance a respectable scientist named Bruno sought to defend and advance the observations of Copernicus that the universe is broad beyond human measurement; that it has many worlds; and that the sun rather than the earth is the physical center of our corner of infinity. Bruno proclaimed the universe as the creation of God, but did not agree with the "right" or earth-centered view of the universe which since Aristotle had been proclaimed by the orthodox. Because he refused to repudiate Copernicus and reaffirm Aristotle's views that the sun and the stars revolve around the earth, he was imprisoned for seven years and then in 1600 (shortly before the first permanent English settlement at Jamestown in America) he was burned at the stake for his heresy. Galileo, his brilliant contemporary, was notified by the church that he faced the same fate if he kept on peddling Copernican notions; Galileo formally recanted and proclaimed the truth to be a lie and was allowed to spend his declining years looking through his telescope, through which he made further useful observations. Johannes Kepler, from another corner of

Christendom, faced lesser pressures of the same sort and, with equal pragmatism, postponed the publication of his own most significant endorsement and advancement of the works of Copernicus. Kepler, however, in wry humor, reportedly observed in substance that since the sun-centered theory of the solar system was not acceptable to the church, and since the church's theory that the sun and the stars revolve around the earth was no longer acceptable to reason, it appeared that the heavenly bodies would have to arrange themselves according to some third order yet to be determined! Even the stars are not beyond reach of "orthodoxy."

The effect that this stifling of scientific inquiry, under the theory of "heresy," had upon the technological and scientific development of Italy and Spain is well known; it was through Newton and others in Britain and Northern Europe that the ensuing advancements of systematic scientific learning took place.

The United States Constitution was drafted after these and similar events had occurred, but not so long after that they had been forgotten. The Founding Fathers certainly shared no unanimity of religious belief or creed; a few years after the Constitution was drafted it has been estimated (by Dr. Ernest Trice Thompson, a Presbyterian seminary teacher, minister and religious historian of note) that not more than five or six Americans out of a hundred were members of the church. This sparing observance of church and organized religious procedures should not be interpreted to mean that early Americans were a bunch of atheists; the Constitution itself, especially including the Bill of Rights, is strong evidence that its framers were, more than they proclaimed, men of God. The First Amendment, however, clearly reflects the charity and the honesty of intelligent men who realized that religion can not be codified by some men for all men; that faith lives always on the edge of doubt; that the origin and ultimate allegiance of mankind can not be demonstrated by science, logic nor logarithms; and that, as Tennyson so aptly puts it (*In Memoriam*), faith is

"Believing where we can not prove."

Faith always has been and must be an individual matter, neither to be denied to others nor to be imposed upon them. All mankind of generations subsequent to Thomas the doubter must continue to live with both faith and doubt, and hope to come within the group of those prophetically described by Christ when He said:

"Blessed are those who have not seen and yet believe." *New Testament*, Book of John, Chapter 20, Verse 29.

In view of the bloody history of tyranny and ignorance which had so frequently followed the union of Cross and crown, the Founding Fathers were obviously interested in freedom *from* religion of state origin or sanction, as much as in freedom *of* religion of their own choice.

■ To discharge a teacher without warning because his answers to scientific and theological questions do not fit the notions of the local parents and teachers is a violation of the Establishment clause of the First Amendment. It is "an establishment of religion," the official approval of local orthodoxy, and a violation of the Constitution. Most people do not attend college. Many do not finish high school. To forbid discussions of scientific subjects like Darwin's theory of evolution on "religious" grounds is simply to postpone the education of those children until after they get out of school. If a teacher has to answer searching, honest questions only in terms of the lowest common denominator of the professed beliefs of those parents who complain the loudest, this means that the state through the public schools is impressing the particular religious orthodoxy of those parents upon the religious and scientific education of the children by force of law. The prohibition against the establishment of religion must not be thus distorted and thwarted. Epperson v. Arkansas, *supra*.

It is not called for, on this record, to speculate what restriction on honest inquiry might have been allowable *if* the school authorities had given clear advance notice to the teacher.

The plaintiff is entitled to relief. Counsel is requested to tender an appropriate judgment.