Catherine J. **HEALY**, et al., Plaintiffs-
Appellants,

v.

F. Don **JAMES**, Individually and as President of Central Connecticut State College, et al., Defendants-Appellees.

No. 733, Docket 35828.

United States Court of Appeals,
Second Circuit.

Argued March 18, 1971.

Decided July 15, 1971.

J. Joseph Smith, Circuit Judge, filed dissenting opinion.

Abraham S. Silver, of Pudlin & Silver, New Britain, Conn. (Alvin Pudlin, on the brief), for plaintiffs-appellants.

F. Michael Ahern, Asst. Atty. Gen. of the State of Conn., Hartford, Conn. (Robert K. Killian, Atty. Gen., on the brief), for defendants-appellees.

Before MOORE and SMITH, Circuit Judges, and TIMBERS, District Judge.*

TIMBERS, District Judge:

Appellants, eight students at Central Connecticut State College (CCSC), New Britain, Connecticut, appeal from a judgment entered after hearings in the United States District Court for the District of Connecticut, T. Emmet Clarie, *District Judge*, dismissing their complaint which sought declaratory and injunctive relief against the President of the College, the Dean of Student Affairs of the

* Chief Judge of the District of Connecticut, sitting by designation.

College, the Dean of Administrative Affairs of the College and the members of the Board of Trustees for the State Colleges of Connecticut. 319 F.Supp. 113 (D.Conn.1970); see also 311 F.Supp. 1275 (D.Conn.1970). We hold that the District Court correctly ruled that defendants, in denying official college recognition to a local chapter of Students for a Democratic Society (SDS), did not violate plaintiffs' constitutional rights of freedom of speech, of freedom of assembly or to the equal protection of the laws; that they did not act arbitrarily or capriciously; but that they did act well within "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines School District, 393 U.S. 503, 507 (1969); and see Epperson v. Arkansas, 393 U.S. 97, 104 (1968).

I.

In order more precisely to focus upon the narrow issue here involved, it may be helpful at the outset to make clear what is not involved. Plaintiffs as individuals have not been denied their rights, on or off campus, to speak, to assemble, to petition or to demonstrate. Nor have they been prevented from organizing off campus any group, club, chapter or other collective activity.

What this case does involve is the narrow question whether the President of the College,[1] upon the specific record before him, properly acted within his broad discretion and comprehensive authority in denying the College's stamp of approval for a local chapter of SDS as an officially recognized campus organization with its attendant privileges. We hold that he did.

II.

The controlling facts are not in dispute. In large measure they were stipulated.

In view of the District Court's clear and comprehensive findings of fact,[2] we shall summarize only so much of the chronology as is believed necessary to an understanding of our decision below.

(A) *Events Leading Up to District Court's Decision of April 24, 1970.*

In common with most colleges and universities, the faculty of CCSC on May 19, 1969 adopted a "Statement on Rights, Freedoms and Responsibilities of Students."[3]

In September 1969, following publication in the student newspaper of a notice of a meeting to organize at CCSC a local chapter of SDS, plaintiffs met and voted to request the administration to grant official recognition to such a chapter on the campus. They sent to Dean Judd

---

1. In addition to the President of the College, the named defendants include the Dean of Student Affairs of the College, the Dean of Administrative Affairs of the College and the members of the Board of Trustees for the State Colleges of Connecticut. It is undisputed that the acts here involved of the President and the Deans were fully known to and approved by the Trustees who are charged by law with the responsibility for policies governing the administration of the College. Conn.Gen.Stat. §§ 10–109, 10–109b (Supp. 1970–71). The Trustees in turn have delegated to the President the power to administer, maintain and supervise the orderly operation of the College. To simplify this opinion, we

shall refer only to the acts and conduct of the President and the Deans of the College, with the understanding that their acts and conduct bind all defendants.

2. Healy v. James, 311 F.Supp. 1275 (D. Conn.1970) (jurisdiction retained pending administrative hearing by President James or his designee); 319 F.Supp. 113 (D.Conn.1970) (summary judgment granted dismissing complaint).

3. In view of the importance to the issues here involved of this "Statement on Rights, Freedoms and Responsibilities of Students," it is set forth in full as an Appendix to this opinion.

an application containing a written statement of the purposes of the proposed "local chapter of Students for a Democratic Society"; this statement, among other things, disclaimed that the local SDS chapter would be "under the dictates of any National organization."

Plaintiffs' application on October 2, 1969 was referred to the Student Affairs Committee (also referred to as the Student Personnel Committee) which is an eight member group advisory to the President, consisting of the Dean of Student Affairs, three faculty members and four students. On October 13, 1969, the Student Affairs Committee, by a 6-2 vote, recommended to President James that the local SDS chapter be given official recognition.

On October 30, 1969, President James rejected the recommendation of the Student Affairs Committee and denied official recognition to the local chapter of SDS. His reasons for this action were set forth in a written memorandum,[4] a copy of which was furnished to plaintiffs on October 30.

On November 6, 1969, after President James had denied official recognition to the local SDS chapter, plaintiffs and others met in the Devils' Den of the Student Center, apparently a campus coffee shop under the administration of the College. Upon being informed that this was a meeting of the "CCSC–SDS" and that its purpose was to discuss President James' action of October 30, Dean Judd and Dean Clow notified the group in writing that they could not meet in the Devils' Den or in any other College property "since the CCSC–SDS is not a duly recognized college organization."

Some three and a half months later, the instant lawsuit was commenced by

4. President James' memorandum of October 30, 1969, insofar as it relates to the proposed local SDS chapter, is as follows:

"I am disapproving recognition of a local chapter of Students for a Democratic Society.

Though I have full appreciation for the action of the Student Affairs Committee and the reasons stated in their minutes for the majority vote recommending approval of a local chapter of Students for a Democratic Society, it is my judgment that the statement of purpose to form a local chapter of Students for a Democratic Society carries full and unmistakable adherence to at least some of the major tenets of the national organization, loose and divided though that organization may be. The published aims and philosophy of the Students for a Democratic Society, which include disruption and violence, are contrary to the approved policy (by faculty, students, and administration) of Central Connecticut State College which states:

'Students do not have the right to invade the privacy of others, to damage the property of others, to disrupt the regular and essential operation of the college, or to interfere with the rights of others.'

The further statement on the request for recognition that 'CCSC Students for a Democratic Society are not under the dictates of any National organization'

in no way clarifies why if a group intends to follow the established policy of the College, they wish to become a local chapter of an organization which openly repudiates such a policy.

Freedom of speech, academic freedom on the campus, the freedom of establishing an open forum for the exchange of ideas, the freedoms outlined in the Statement on Rights, Freedoms and Responsibilities of Students that 'college students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right of petition'—these are all precious freedoms that we cherish and are freedoms on which we stand. To approve any organization or individual who joins with an organization which openly repudiates those principles is contrary to those freedoms and to the approved 'Statement on the Rights, Freedoms, and Responsibilities of Students' at Central."

President James' memorandum of October 30 approved recognition of a Commuter Club, a Physical Education Majors Association, a Liberal Party and an Italian Club; each was approved as a campus organization and a faculty adviser was assigned to each.

the filing of the complaint on February 24, 1970.[5] Plaintiffs [6] sought declaratory and injunctive relief, the primary thrust of which was to obtain official college recognition of "a chapter of Students for a Democratic Society . . . as a campus student organization."

After the pleadings were closed and a stipulation of facts was filed, Judge Clarie on March 23, 1970 held a hearing on plaintiffs' motion for a preliminary injunction. While the hearing was devoted mainly to marking of exhibits and to arguments of counsel, it was anything but perfunctory. Judge Clarie's questions to counsel on both sides were perceptive and pervasive; [7] they clearly indicated the lines of inquiry he thought should be pursued at the administrative hearing he subsequently ordered.

(B) *District Court's Decision of April 24, 1970.*

On April 24, 1970, Judge Clarie filed a comprehensive 14 page memorandum of decision. 311 F.Supp. 1275. He reviewed the events which led to the lawsuit. He summarized the claims of the parties, noting that plaintiffs did not challenge the constitutionality of the standards established by the College for determining whether campus organizations are to be recognized, but that they did claim as a denial of procedural due process the action of President James, without affording plaintiffs a hearing, in denying their application for official recognition of a local SDS chapter and particularly in going outside plaintiffs' application and attributing to plaintiffs the aims and purposes of the national

organization of SDS which he in turn found to be contrary to the policies of CCSC as set forth in its "Statement of Rights, Freedoms and Responsibilities of Students" (Appendix, pp. 1135, 1136, *infra*). In this connection, Judge Clarie pointed out an ambiguity on the face of plaintiffs' application which he suggested should be clarified at an administrative hearing:

"The ambiguity in this application is patent in that it states that the petitioners wish to become a 'local' chapter of SDS. The term itself, 'local chapter,' strongly infers some kind of affiliation with a more extensive parent organization; yet the application specifically represents that the local group would not be under the dictates of the national organization. The college administration may wish to have this ambiguity clarified and the credibility of the representations ascertained and verified." 311 F.Supp. at 1282.

Then, after a careful analysis of the pertinent authorities, the upshot of Judge Clarie's April 24, 1970 decision was to order that an administrative hearing be held in accordance with the following blueprint (311 F.Supp. at 1282–83):

(1) The hearing was to be held within 30 days.

(2) Reasonable notice was to be given to all parties.

(3) The hearing was to be conducted by either President James "or a hearings officer duly designated by him and acting in his stead."

(4) All plaintiffs were to be afforded an opportunity to be heard.

---

5. The record is silent as to why plaintiffs, prior to bringing suit, did not avail themselves of their administrative right of appeal as provided in Article III, Section E, of the "Statement on Rights, Freedoms and Responsibilities of Students" (Appendix, p. 1134, *infra*) :

"The judicial process shall be such that students have the right to appeal not only disciplinary action deemed unwarranted but also a college regulation or policy considered unjust. The decision

of the appeal court shall be final, subject only to the student's appeal to the President of the College or ultimately to the Board of Trustees."

6. Plaintiffs have been represented by retained counsel throughout proceedings in the District Court and in this Court, as well as in the college administrative proceedings referred to below.

7. Transcript of March 23, 1970 Hearing, pp. 1–55.

(5) Cross-examination of witnesses was to be allowed.

(6) A record of the hearing was to be made.

(7) The hearing was to be conducted "in a climate of respectful civility."

(8) Without attempting to restrict the scope of the hearing, the following lines of inquiry were suggested by Judge Clarie:

(a) "The initial question might be whether or not a local unaffiliated chapter of SDS can lawfully exist without being subject to the dictates of the national organization."

(b) "A copy of the organization's charter, by-laws or other similar type of document might be helpful on this point."

(c) "In light of the recent fragmentation of the National SDS, it might also be relevant to know of which faction, if any, this group wishes to become a local chapter."

(d) "Were it to be found to be impossible for a local chapter of SDS to exist without being affiliated with the national parent organization, could the aims and philosophy of the latter group become relevant and important?"

(9) Minutes of the October 2 and October 13, 1969 meetings of the Student Affairs Committee were to be produced.

(10) Judge Clarie directed that President James, after the conclusion of the administrative hearing and upon the overall record, "make his findings as to whether or not the application met the existing policy standards of the college, which would qualify the applicant club for official campus recognition."

(11) Jurisdiction was retained by the District Court for the entry of such further orders or judgments as might be necessary and appropriate.

(C) *College Administrative Hearing of May 19 and May 25, 1970.*

The administrative hearing ordered by Judge Clarie was held in the CCSC Administration Building in New Britain on May 19 and May 25, 1970. Notice of the hearing was given to and acknowledged by all interested parties, including each individual plaintiff and plaintiffs' retained counsel who was present throughout.

While one of the primary purposes of the hearing was to afford plaintiffs the procedural due process Judge Clarie found had been denied them by President James' action of October 30, 1969 without a hearing, it became quickly apparent at the first session of the hearing on May 19 that the notion of procedural due process entertained by plaintiffs' counsel was quite different from that contemplated by Judge Clarie.

The following are examples, selected at random, of the disruptive tactics resorted to by plaintiffs' counsel at the administrative hearing:

(1) Although Judge Clarie ordered that a record be made of the hearing, plaintiffs' counsel spent two and a half pages of the transcript objecting to the presence of a tape recorder,[8] concluding that "I'm objecting to the use of this device because this device cannot talk back and tell me when it doesn't hear me. . . ."[9]

(2) Despite Judge Clarie's order that the hearing be conducted by either President James "or a hearings officer designated by him," plaintiffs' counsel took up another page of the transcript objecting to President James' absence and his designation of Dean Judd as the hearing officer,[10] stating that "I take the position that the hearing is not proper-

8. Transcript of May 19, 1970 Hearing, pp. 5–7.

9. *Id.* at 7.

10. *Id.* at 7–8.

ly conducted notwithstanding Judge Clarie's statement."[11] Upon being overruled, plaintiffs' counsel then moved to postpone the hearing and again was overruled.[12]

(3) While Judge Clarie had ordered that "[a]ll of the plaintiffs in this action shall be afforded an opportunity to be heard," plaintiffs' counsel made it clear at the outset that he was going to do the testifying, not the plaintiffs: "Well, as far as I'm concerned, I will make all the remarks that have to be made. I'm not foreclosing any one of my people from speaking, but as far as I'm concerned, I have no reasons for them to make any statements."[13] Of the eight named plaintiffs, only two appeared at the May 19 hearing, one at the May 25 hearing. Plaintiffs' counsel did all the talking. Plaintiffs themselves did not testify at all, with one minor exception.[14]

(4) Having effectively sealed off the individual plaintiffs from testifying, plaintiffs' counsel thereupon called President James as a witness on behalf of plaintiffs at the May 25 hearing. Having in mind the purpose of the administrative hearing ordered by Judge Clarie and his directive that President James upon the overall record "make his findings as to whether or not the application met the existing policy standards of the college," plaintiffs' counsel proceeded to ask James questions such as the following:

"Dr. James, you—I withdraw that. Have you already decided this case?"[15]

\* \* \* \* \*

"Dr. James, you addressed the Lions Club last week, did you not?"[16]

\* \* \* \* \*

"Dr. James, do you intend to offer any evidence in which the creditability of any of these students is under attack?"[17]

(5) After reading to Dr. James the only evidence offered by plaintiffs at the two day hearing—a statement of change of name of plaintiffs' proposed organization from "local chapter of Students for a Democratic Society" to "Students for a Democratic Society of Central Connecticut State College"—plaintiffs' counsel then asked President James: "Now, does that statement help you in making a judgment?"[18]

(6) The attempt by plaintiffs' counsel to talk to President James off the record is reflected in the following colloquy:[19]

"Attorney Silver: Yes, could we go off the record? I'd like to talk to Dr. James.

Dean Judd: No, sir.

Attorney Silver: Will the record show that I wanted to talk to Dr. James 'off the record', and I was told that I couldn't do so?

Dean Judd: That request is denied. Dr. James is here as your witness, counselor. We are conducting a hearing; we're not going out of session.

Attorney Silver: I'm outraged!"

Plaintiffs' counsel clearly understood the nature of the proceeding and President James' role therein:

"Well, he's my witness and he's also the person who's going to

---

11. *Id.* at 7.

12. *Id.* at 8.

13. *Id.* at 4.

14. Transcript of May 25, 1970 Hearing, pp. 40–41.

15. *Id.* at 26.

16. *Id.* at 27.

17. *Id.* at 30.

18. *Id.* at 29.

19. *Id.* at 32–33.

make the decision in a quasi-judicial proceeding—an administrative proceeding." [20]

(7) Finally, the motivation for calling President James as a witness on behalf of plaintiffs is perhaps best reflected in the following exclamation by plaintiffs' counsel:

"Attorney Silver: This is really terrific." [21]

The only substantive evidence produced by plaintiffs at the two day administrative hearing on May 19 and 25, 1970 was the statement,[22] referred to above, changing the name of plaintiffs' proposed organization to "Students for a Democratic Society of Central Connecticut State College" and reaffirming the disclaimer, set forth in their original statement of purposes, of any connection with the national SDS organization.

Defendants on the other hand, in compliance with the lines of inquiry suggested by Judge Clarie,[23] produced a number of documentary exhibits, briefly summarized as follows:

(1) Notices of the administrative hearing and responses by plaintiffs and their counsel thereto.[24]

(2) Transcripts of Hearings before the Committee On Internal Security of the House of Representatives, 91st Cong., 1st Sess., on June 3–4, 5, 17, July 22, October 28–30, 1969, upon the subject of "Investigation of Students For A Democratic Society" (Georgetown University; Akron, Ohio; Detroit, Mich.; and Pittsburgh, Pa.).[25]

(3) Minutes of the CCSC Student Personnel Committee Meeting of October 2, 1969.[26]

(4) Minutes of the CCSC Student Affairs Committee Meeting of October 13, 1969.[27]

At the October 2, 1969 meeting of the CCSC Student Personnel Committee, referred to above, among the questions asked by the Committee, and the answers given by the SDS representative present, were the following:

"Q. How would you respond to issues of violence as other S.D.S. chapters have?

A. Our action would have to be dependent upon each issue.

Q. Would you use any means possible?

A. No I can't say that; would not know until we know what the issues are.

\* \* \* \* \*

Q. Could you envision the S.D.S. interrupting a class?

A. Impossible for me to say."

It should be borne in mind that the foregoing questions and answers were included in the very minutes that Judge Clarie suggested be produced at the administrative hearing. Although more than seven months had elapsed between the time this testimony was given by the SDS representative and the time the minutes were marked in evidence at the administrative hearing, significantly *the same SDS representative* who gave the testimony at the October 2, 1969 meeting was the *one plaintiff* present at the May 25, 1970 administrative hearing, viz. Miss Catherine Healy. Although accompanied by counsel, she sat silently by when her previous testimony was received in evidence.

Indeed, sitting silently by was just about all that any of the plaintiffs present at either the May 19 or the May 25 hearing did or were permitted to do by their counsel. And although plaintiffs' counsel purported to be their spokesman, he repeatedly refused either to respond

20. *Id.* at 30.
21. *Id.* at 28.
22. Applicant's Ex. 1.
23. 311 F.Supp. at 1282.
24. Exs. B, C, D, E, F, K and M.
25. Exs. G, H, I and N.

26. Ex. O.
The Student Personnel Committee is the same eight member group whose name was changed to the Student Affairs Committee at the October 2, 1969 meeting.

27. Ex. P.

himself to questions put by the hearing officer or to permit plaintiffs to respond. Such intransigence was demonstrated over and over again in response to questions by the hearing officer directed to the exhibits and to the precise lines of inquiry suggested by Judge Clarie.[28] One example is the following response by plaintiffs' counsel to a question by the hearing officer:

> "Dean Judd: All right. A question—an additional question, then, Attorney Silver—is, we would like to know why the applying organization wishes to use a name of an existing national organization if it will have no attachment or affiliation with it?
>
> Attorney Silver: Well, I didn't participate in the selection of name, but the word 'democracy' sounds pretty good to me. It always has been a good word." [29]

### (D) President James' Decision of July 10, 1970.

On July 10, 1970, President James again denied plaintiffs' application for official recognition as a campus organization. His decision was set forth in a letter to the Dean of Student Affairs, a copy of which was furnished to plaintiffs.

After summarizing the record of administrative proceedings before the hearing officer, including specific references to questions asked by the hearing officer and exhibits received in evidence, President James stated his reasons for denying the application:

(1) Failure of plaintiffs "to resolve a significant question which the College sought to clarify," namely, "what is the nature of affiliation or association of the applying group?" and, specifically, "[i]f the group utilizes the name of an existing organization, how can it 'not be under the dictates of any organization' as the applying group stated?"

(2) Article III of the national constitution of SDS [30] provides that independent groups which may affiliate as associates "are expected to operate within the broad terms of policies set by the national convention and the national council."

(3) The documentary exhibits received in evidence, absent any disclaimer by plaintiffs of intent to resort to similar disruption or violence,[31] indicated that plaintiffs' prospective campus activities were likely to cause a disruptive influence at CCSC.

President James concluded as follows:

> "Accordingly, in view of the documentary evidence filed by the Hearing Officer, and the intransigence of counsel for the applicants, I reaffirm my earlier decision to deny recognition to the applying group. Recognition of such group, in my judgment, would be contrary to the orderly process of change and would be contrary to the philosophy and lawful mission of this College."

### (E) District Court's Decision of October 29, 1970.

Upon receipt of President James' decision of July 10, plaintiffs filed in the District Court a motion to reject James' findings and to grant the injunctive relief sought in the complaint. Judge Clarie held a further hearing on September 28, 1970, at which time he heard further arguments of counsel.

On October 29, 1970, Judge Clarie filed a further 10 page memorandum of decision. 319 F.Supp. 113. In view of the absence of any material issues of fact, he treated the record before him as though cross-motions for summary judgment had been filed and proceeded to determine the question of law thus presented. Rule 56, Fed.R.Civ.P.

He reviewed the prior proceedings, particularly the administrative hearing he had ordered. He analyzed the addi-

---

28. Transcript of May 25, 1970 Hearing, pp. 37–41.

29. *Id.* at 38–39.

30. Ex. G, p. 2107.

31. Exs. O and P. See p. 1128, *supra.*

tional evidence presented and President James' decision of July 10.

The essence of Judge Clarie's decision of October 29 was that plaintiffs had not met their burden of complying with the standard established by the College's "Statement on Rights, Freedoms and Responsibilities of Students"; that until they did so, they had no constitutional or other right to have the College's stamp of approval conferred upon their organization; and that President James' discretionary action in denying the application, upon the specific record before him, could not properly be magnified into an interference with constitutionally protected rights.

Judge Clarie succinctly summarized his conclusion as follows:

"The opportunity of an open dialogue, with a free, uninhibited but respectful expression of ideas between teacher and student, scholar and scholar, with its attendant critical exchange exposed to full view, creates the epitome of the college students' never ending search for truth. This autonomy of intellectual freedom of academic expression has not been materially deterred or lessened by the College President's action. He is held responsible for the climate of campus discipline. To be effective in carrying out his responsibilities, he must be afforded broad discretionary authority with which to achieve it." 319 F.Supp. at 116.

### III.

We believe that the foregoing recital of events from the spring of 1969 through the fall of 1970—including the words and actions of the parties themselves—compels but one decision in this case.

■ We start with the premise that "for good or ill, the Constitution has come to the campus." Wright, The Constitution on the Campus, 22 Vand.L. Rev. 1027, 1033 (1969). And we yield to none in our profound belief that the full panoply of constitutional rights, duties, privileges and immunities should be fully implemented on every campus, whether of a public or private college, the campus being "undoubtedly a 'marketplace of ideas.'" Eisner v. Stamford Board of Education, 440 F.2d 803, 807 and 808 n. 5 (2 Cir. 1971).

In order that there be full implementation of the Constitution on the campus, all constituencies must be active and willing participants; that includes administration, faculty, students and, occasionally, alumni as well. In short, to be effective, there must be a free flow of rights and responsibilities on the part of all concerned before life under the Constitution on the campus can have meaning.

Here, as the record makes painfully clear, the fountain was poisoned before it began to flow.

Despite the concededly valid college policy governing the constitutional rights, freedoms and responsibilities of students at CCSC,[32] plaintiffs failed to avail themselves of the procedural due process accorded to them and thus prevented the President of the College and the administration from applying that policy to plaintiffs' application so as to implement the undoubted authority of the college officials to control student conduct, consistent with fundamental constitutional safeguards.[33]

---

32. "Statement on Rights, Freedoms and Responsibilities of Students," set forth as an Appendix, *infra.*

As we recently held in Eisner v. Stamford Board of Education, 440 F.2d 803, 808 (2 Cir. 1971), "to the extent that the Board's policy statement here merely vests school officials under state law with authority which under *Tinker* [393 U.S. 503, 507 (1969)] they may constitutionally exercise, it is on its face unexceptionable."

33. Tinker v. Des Moines School District, 393 U.S. 503, 507 (1969); Eisner v. Stamford Board of Education, *supra* note 32, at 807.

Specifically, although Judge Clarie and the college administration made clear the information required of plaintiffs, they failed to comply in at least the following essential respects:

(1) They failed to submit a copy of their charter or by-laws.[34]

(2) They failed candidly to clarify the apparent conflict between the name of their proposed organization, "Students for a Democratic Society of Central Connecticut State College," and their disclaimer of being under the dictates of the national SDS organization.[35]

(3) They failed candidly to respond to inquiries whether they would resort to violence and disruption on the CCSC campus, including interruption of classes.[36]

(4) They failed to testify at the administrative hearing and to subject themselves to cross-examination despite Judge Clarie's explicit direction.[37]

(5) They failed to offer any evidence whatsoever at the administrative hearing designed to enable the college administration and Judge Clarie to resolve the issues for which the hearing was ordered; but, on the contrary, they sanctioned conduct at the hearing just the opposite of the "climate of respectful civility" ordered by Judge Clarie.[38]

Upon this record, Judge Clarie held that plaintiffs had not met their burden of complying with the standard established by the college for recognition of campus organizations; that until they did so, they had no constitutional or other right to claim the college's stamp of approval upon their organization; and that the discretionary action of President James in denying their application could not be blown up into an interference with constitutionally protected rights. 319 F.Supp. at 116–17. We agree.

We wish to emphasize the narrow ground of our decision as stated. And we especially emphasize that we find it neither necessary nor appropriate, upon this record, to reach the substantive constitutional questions [39] which might

---

34. Three other campus organizations (the Commuter Club, the Physical Education Majors Association and the Liberal Party), *supra* note 4, which were approved by President James in his memorandum of October 30, 1969 (simultaneously with his disapproval of the local chapter of SDS) did submit copies of their constitutions.

35. *Supra,* p. 1129.

36. *Supra,* p. 1129.

37. *Supra,* pp. 1125, 1126.

38. *Supra,* pp. 1126–1128; 1125, 1126.

39. While we do not find it necessary or appropriate to reach, for example, the questions whether the national SDS organization was prone to violence and, if so, whether denial of recognition to plaintiffs' local organization—identified by name with the national—violated plaintiffs' constitutional right of assembly, it is clear, in view of the record (Exs. G, H, I and N; *supra,* page 1128), that President James and the college administration were fully justified in inquiring into the relationship between the national SDS

organization and a proposed local organization bearing the SDS label. For there is little doubt that during the period here involved, and immediately prior thereto, the SDS had engaged in campus violence and disruption. See Cole v. Trustees of Columbia University, 300 F.Supp. 1026, 1028 (S.D.N.Y.1969). And for its bearing upon the *reasonableness* of the inquiries by President James and Judge Clarie into the relationship between plaintiffs' proposed local SDS organization and the national SDS organization, see Address by Hon. Jerris Leonard, Assistant Attorney General of the United States, at Conference of Association of Governing Boards, St. Louis, Mo., on October 6, 1970:

"In the first half of the 1967–68 academic year, 71 demonstrations were reported on 62 campuses across the nation. In the second half of that same year, 221 demonstrations took place on 101 campuses.

A jarring 850 demonstrations were reported the following academic year, 1968–69, resulting in over 4,000 arrests, 125 student injuries and 1 death. Ar-

have been presented if plaintiffs had availed themselves of the procedural due process to which Judge Clarie ordered they were entitled and which the college administration accorded them.[40]

We hold in short that, upon the specific record before him, President James properly acted within "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines School District, *supra* note 33, at 507; Eisner v. Stamford Board of Education, *supra* note 32, at 807.

As applied to a college, this rule, which is the ground of our decision, has been well stated in Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8 Cir. 1969) (Blackmun, J.):

"We . . . hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct."

Affirmed.

son attempts or successful arson incidents numbered 61.

In this past year, 1969–70, these already shocking numbers nearly doubled: 1,785 demonstrations were reported on campuses across the United States, causing some 462 injuries and 8 deaths; 7,200 arrests were made, 246 arson incidents or attempts, and 14 bombings.

In the two-week period following the invasion of Cambodia, the incidents of violence, injury, arrests, and number of demonstrations were greater than in the entire preceding period of that academic year."

The *reasonableness* of the inquiries made by President James in a nationwide campus atmosphere of ticking timebombs can hardly be open to serious question. See Schenck v. United States, 249 U.S. 47, 52 (1919).

J. JOSEPH SMITH, Circuit Judge (dissenting):

I respectfully dissent.

In September, 1969 a notice appeared in the school newspaper of Central Connecticut State College announcing an organizational meeting of a local chapter of the Students for a Democratic Society. At this meeting officers were elected and those present voted to request the administration of the College to grant official recognition to the organization. On September 17, 1969 the students involved submitted a written memorandum setting forth the purposes and goals of the group to the Dean of Students as required by the College's regulations.

What follows is a brief statement of purpose of the group of students at CCSC who would like to form a local chapter of Students for a Democratic Society:

(1) Because the university is intended to be the arena of education, where there is an unfettered exchange of ideas, SDS would provide a forum of discussion and self-education for students developing an analysis of American society and institutions, including higher education, and the world situation in general.

40. Questions of constitutional law should not be decided unless absolutely necessary to a decision in the case and certainly not upon a record, as here, which does not adequately raise a constitutional issue. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring). And see Welsh v. United States, 398 U.S. 333, 354–56 (1970) (Harlan, J., concurring); Chandler v. Judicial Council, 398 U.S. 74, 92 (1970) (Harlan, J., concurring); Dandridge v. Williams, 397 U.S. 471, 475–76 (1970); Zschernig v. Miller, 389 U.S. 429, 444–45 (1968) (Harlan, J., concurring). See also Tenneco, Inc. v. Greater LaFourche Port Commission, 427 F.2d 1061, 1065 (5 Cir. 1970); State of Texas v. Grundstrom, 404 F.2d 644, 648–649 (5 Cir. 1968); Bauers v. Heisel, 361 F.2d 581, 588 (3 Cir. 1966).

(2) Because it is felt that ideas without parallel in deeds are empty and ephemeral, and that no area of life exists in a vacuum and unrelated to all other areas of life, SDS would provide an agency for integrating thought with action so as to bring about constructive changes in the university, in American life, and [in] the world.

(3) Because of the responsibility of all peoples for the welfare of others, SDS would provide a coordinating body for relating the problems of leftists students and other groups, such as the student body as a whole, the working class, the black populace or whatever other individuals or groups in fact or potentially in accord with the purposes of the CCSC chapter of SDS.

Officers: Lawrence Stub, Frank Siccardi. Procedures: (1) meetings once a week. (2) membership completely open to students and faculty. (3) voluntary dues. (4) elections held regularly. (5) CCSC Students for a Democratic Society are not under the dictates of any National organization.

As the majority opinion relates, after a long series of hearings lasting over some months, the application was finally rejected by the President of the College in May, 1970.

Before examining the important first amendment issues raised by this case, we should be clear as to the precise consequences of the appellee's actions now approved by this court. Contrary to the repeated assertions in the majority's opinion, this is not a situation where the question is merely whether or not the students will receive "official" recognition for their organization. The record clearly shows that what is at issue is whether these students will be permitted to use the buildings and grounds of the campus to conduct meetings and discussions and is thus analogous to an attempt by the authorities to prevent a particular group or individual from speaking on the school premises.[1] The constitutional problems which this action presents are clearly, therefore, of consequence.

We may well begin with Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). There the three petitioners, ranging in age from thirteen to sixteen, protested the Viet Nam war by wearing black armbands to school in defiance of a ban on armbands adopted two days earlier by school officials in anticipation of the protest. The petitioners then brought an action pursuant to 42 U.S.C. § 1983 seeking to enjoin on first amendment grounds further discipline of the students for violating the no-armband rule. The Court found for the students holding that their "silent, passive expression of opinion" was an exercise of "primary First Amendment rights" which could be prevented only upon a showing that engaging in this conduct "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."[2]

The holding in *Tinker* articulated for the first time a broad educational philosophy based on the first amendment.[3] The Court quoted at length from Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), where it had struck down a loyalty oath required of all state teachers:

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." [Citations omitted.] The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange

---

1. As noted in the majority opinion, the appellees attempted to prevent the students from meeting in the school cafeteria.

2. See, Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966).

3. Since Tinker was concerned with high school students where the Court has held, in other contexts, that first amendment rights may be more limited (cf. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), it follows *a for-*

of ideas which discovers truth "out of a multitude of tongues [rather] than through any kind of authoritative selection."

School authorities may never merely suppress "feelings with which they do not wish to contend," nor may they treat students as "closed-circuit recipients" of the dominant views of the community. The Court emphasized that personal communication among students outside the classroom is one of the activities to which the schools are dedicated. Noting that the exercise of fundamental freedoms often entails risk, the Court said a school may not silence its students simply "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." "In short, the Court adopted the view that the process of education in a democracy must be democratic." [4]

It is perhaps arguable that a college or university might deny the use of its facilities to any political organization, although the courts have in recent years greatly expanded the exercise of first amendment rights on other types of public or even privately owned premises.[5] The record below, however, indicates that the College granted recognition,

and thus the use of its facilities, to other political groups and organizations. Once approval has been granted to some, it cannot be denied to others "according to orthodoxy or the popularity of their political or social views," for to do so would be "blatant political censorship." [6]

There are apparently no reported cases in the federal courts dealing with the precise issue raised here.[7] As noted above, the closest analogy would appear to be those cases involving attempts to prevent a particular speaker from appearing on the campus. As Professor Wright has pointed out, there is not a single reported case in recent years where a speaker-ban has been upheld.[8]

The actions of the appellees do, by their very nature, constitute a "prior restraint" upon the freedom of speech and assembly. As the Court noted in Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963): "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." [Cf. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1

---

*tiori* that the scope of first amendment rights guaranteed to college students is at least as great as those accorded to persons of a more tender age. The average college student is more than 21 years old. Soglin v. Kauffman, 295 F.Supp. 978, 988 (W.D.Wisc., 1968).

4. Michelman, "The Supreme Court, 1968 Term," 83 Harv.L.Rev. 1, 159 (1969).

5. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (grounds of the state capital); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (park); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S. Ct. 1601, 20 L.Ed.2d 603 (1968). See, Note, "Regulation of Demonstrations," 80 Harv.L.Rev. 1773 (1967).

6. Brooks v. Auburn University, 296 F. Supp. 188, 194 (M.D.Ala., 1969).

7. In Saxton v. Board of Regents, No. 123– 165, Cir. Ct. Dane County, Wisconsin, May 21, 1968 (unreported), a state trial

court upheld the denial of official recognition of an SDS chapter.

8. "A speaker cannot be refused permission to speak on campus because he has been convicted of a felony [Brooks v. Auburn University *(supra)*] or is under indictment for murder [Student Liberal Federation v. Louisiana State University, Civ. No. 69–300, E.D.La., Feb. 15, 1968 (unreported)] or because he urges or advocates violation of the laws [Brooks v. Auburn University *(supra)*] or because he is an admitted member of the Communist Party. [Egan v. Moore, 20 A.D.2d 150, 245 N.Y.S.2d 622 (1963), aff'd 14 N.Y.2d 775, 250 N.Y.S.2d 809, 199 N.E. 2d 842 (1964).] A speaker may not be required to promise that he will not use his speech to publicize the activities of any 'subversive, seditious, and un-American organization.' [Snyder v. Board of Trustees, 286 F.Supp. 927 (N.D.Ill., 1968).] A forum cannot be constitutionally denied to 'subversive elements' [Danskin v. San Diego Unified School District, 28 Cal.2d 536, 171 P.2d 885 (1946)] nor even to groups seeking overthrow of

(1971); New York Times v. United States, 403 U.S. ——, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).] In order to withstand constitutional attack, prior restraints must be narrowly drawn so as to suppress speech or assembly which presents a "clear and present danger" of a substantial evil. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1950), or at least in the present context, the likelihood that it would "materially and substantially disrupt the work and discipline of the school." Tinker v. Des Moines Independent Community School District (*supra* 393 U.S. at 513, 89 S.Ct. at 740). Contrary to the position taken by the majority, it appears to me to have been established beyond doubt that the burden of providing a justification for this type of prior restraint rests squarely on the shoulders of those who seek to impose it. The appellees have not come forward with any evidence as to a threat of substantial disruption of the operation of the school by the appellants.

When the College President rejected the approval by the Student Affairs Committee of the applicants as a local chapter under the SDS label as an approved campus club, the applicants were effectively denied freedom of on-campus association and speech. It is true, as the majority makes plain, that the applicants' counsel did try the patience of Dean Judd as hearing officer, but this is not sufficient ground for denying them the right to be heard on campus.

Of course, if these applicants took part in violent or disruptive activities they would be subject to collegiate discipline as well as criminal prosecution, and any recognition could be withdrawn for

cause. The record, however, shows no such activity, but only a fear of some such possibility, based on activities of others in other places at other times, and on the suspect "philosophy" of the applicants.

Those charged with the governance of our educational institutions have in recent years been under increasing pressure from forces now at work on the fabric of American society. These conflicting demands have been particularly intense in the state college and university systems where administrators are directly responsible to the political process. Yet one would hope that educators would be among the first to recognize how essential it is in such periods of stress to hold fast to the rule of law. If support for basic constitutional liberties is weakened on the nation's campuses, they will not long maintain their viability in society as a whole. Misguided, immature, unpopular groups, such as this may be, provide the acid test of the genuineness and strength of our freedoms. The instincts and action of the Student Affairs Committee were quite in accord with our constitutional principles, and might better have been adopted on review.

I would, therefore, reverse and remand the case to the district court with instructions to grant the injunctive relief sought by appellants.

## APPENDIX
## CENTRAL CONNECTICUT STATE COLLEGE
### New Britain, Connecticut
### *STATEMENT ON RIGHTS, FREEDOMS AND RESPONSIBILITIES OF STUDENTS*
### PREAMBLE

Academic institutions exist for the transmission of knowledge, the pursuit

---

the government by force and violence [A.C.L.U. v. Board of Education, 55 Cal. 2d 167, 10 Cal.Rptr. 647, 359 P.2d 45 (1961)]. It will not do to limit speakers to those who 'clearly serve the advantage of education' or to lease the auditorium only for programs 'determined to

be compatible with the aims of [the college] as an institution of higher learning.' [Dickson v. Sitterson, 280 F.Supp. 486 (M.D.N.C., 1968).]" Wright, "The Constitution on the Campus," 22 Vand.L.Rev. 1027, 1051, 1052 (1969).

of truth, the development of students and the general well-being of society. In line with this purpose, the college has the duty to protect the indispensable freedoms of inquiry and expression and furthermore has the responsibility to encourage all of its members in developing the capacity for critical judgment in their sustained and independent search for truth.

The formulation of detailed procedures for securing the student's freedom to learn is the responsibility of each institution and must be in harmony with the educational purpose of the institution and will vary from campus to campus. The most basic concept of order or government is expressed as policy in order to allow a community to carry out its functions. The responsibility for such government becomes the responsibility of each individual in that community.

## I. *IN THE CLASSROOM*

A. *Right to Freedom of Expression*

Each student is free to take reasoned and reasonable exception—without interference—to data and views presented in any course and free from arbitrary dismissal from that course. It shall be understood that part of any course content may involve development of the ability to express scholarly opinions. It shall also involve development of motivation to learn, guidance in independent study and encouragement of the student to develop his fullest potential. The student's responsibility is to exercise his freedom of expression within orderly procedures consistent with the situation and in a manner that reflects thought, scholarly analysis and knowledge of the course material.

B. *Right to Adequate Instruction*

Each student has the right to be instructed by a professor who presents course material relevant to his discipline and maintains established standards for academic perform-

ance. Moreover, each student has a right to professors who are adequately prepared for class and accessible for individual conferences. It is the responsibility of the student to profit from adequate instruction, seeking individual help when needed and preparing before class so that he may fully understand the nature of the material presented.

C. *Right to Proper Academic Evaluation*

Each student has the right to be evaluated entirely upon the basis of his academic performance and not on opinion or conduct or matters not related to academic standards. This right shall be guaranteed by orderly, clearly defined procedures. Each student has the right to see and have explained to him evaluated material so that he can know his strong and weak points. It is the student's responsibility to know the basis for evaluation and to understand the procedures.

## II. *STUDENT RECORDS AND DISCLOSURE*

A. Institutions shall have a carefully considered policy as to the information which should be a part of a student's permanent educational record and as to the conditions of its disclosure. To minimize the risk of improper disclosure, academic and disciplinary records shall be separate and the conditions of access to each shall be set forth in an explicit policy statement. Transcripts of academic records shall contain only information about academic status. Data from academic, disciplinary, and counseling files shall not be available to unauthorized persons on campus or to any person off campus without the express consent of the student involved except under legal compulsion.

B. Academic records and recommendations are permanently on file at the college. No records shall be kept

which reflect the political activities or political beliefs of students. Provision shall also be made for routine destruction of disciplinary records after seven years from graduation. Administrative staff and student personnel officers shall respect confidential information about students which they acquire in the course of their work.

C. Disciplinary records of students who leave the college without graduating may be saved for no more than seven years for reference in the event a student applies for reentry to the institution.

D. Information about student views, beliefs, and political associations which professors acquire in the course of their work as instructors, advisors, and counselors should be considered confidential. Protection against improper disclosure is a serious professional obligation. Judgments of ability and character may be provided under appropriate circumstances, normally with the knowledge or consent of the student.

III. *RIGHTS AND OBLIGATIONS RELATING TO DUE PROCESS*

A. Except for reasons related to the physical or emotional safety of students, faculty, or college property, college sanctions against individuals accused of violations of college regulations, local, state or federal laws shall not be applied until the individual is convicted of such violation.

B. The college shall define its own regulations as clearly as possible and publish them in a form which is readily accessible to all students. It is the responsibility of the student to familiarize himself with regulations of the college. The jurisdiction of faculty or student judicial boards, the disciplinary responsibilities of college officials and the legal disciplinary procedures, including the students' right to appeal a decision, shall be clearly formulated and communicated in advance. The student shall be as free as possible from imposed limitations that have no direct relevance to his education.

C. An individual accused of a breach of college regulations shall be informed of his rights by a college official and presumed innocent until proven guilty. The accusing party shall have the burden of proving such guilt. No form of harassment shall be used by institutional representatives to coerce admissions of guilt or information about conduct of other suspected persons.

D. Except under emergency circumstances, premises occupied by students and the personal possessions of students shall not be searched unless appropriate authorization has been obtained. For premises such as residence halls controlled by the institution, an appropriate and responsible authority shall be designated to whom written application shall be made before a search is conducted. The application shall specify the reasons for the search and the objects or information sought. The student shall be present, if possible, during the search. For premises not controlled by the institution, the ordinary requirements for lawful search shall be followed.

E. The college has the responsibility for establishing adequate judicial procedures for students accused of infractions. The accused has the right to challenge the impartiality of the judicial agent. The judicial process shall be such that students have the right to appeal not only disciplinary action deemed unwarranted but also a college regulation or policy considered unjust. The decision of the appeal court shall be final, subject only to the student's appeal to the President of the College or ultimately to the Board of Trustees.

F. A student accused of violating college regulations has the right to

seek the aid of any member of the college community to aid in his defense.

G. Sanctions shall be fairly and impartially applied and not in violation of the student's right to proper academic evaluation.

## IV. OFF-CAMPUS FREEDOM OF STUDENTS

A. Exercise of Rights of Citizenship —College students are both citizens and members of the academic community. As citizens, students shall enjoy the same freedom of speech, peaceful assembly, and right of petition that other citizens enjoy and, as members of the college community, they are subject to the obligations which accrue to them by virtue of this membership. Faculty members and administrative officials shall insure that institutional powers are not employed to inhibit such intellectual and personal development of students as is often promoted by their exercise of the rights of citizenship both on and off campus.

B. Activities of students may upon occasion result in violation of law. In such cases, college officials shall be prepared to apprise students of sources of legal counsel and may offer other assistance. Students who violate the law may incur penalties prescribed by civil authorities, but college authority shall never be used merely to duplicate the function of civil laws. Only where the college's interests as an academic community are distinct and clearly involved shall the special authority of the college be asserted. The student who incidentally violates college regulations in the course of his off-campus activity, such as those relating to class attendance, shall be subject to no greater penalty than would normally be imposed. College action shall be independent of community pressure.

## V. ON CAMPUS FREEDOM OF STUDENTS

If the individual rights of a student are to be preserved, certain standards must be maintained in student affairs.

A. Care shall be taken in the establishment and organization of campus groups so that the basic rights, freedoms and responsibilities of students will be preserved.

B. Student organizations shall submit a clear statement of purpose, criteria for membership, rules of procedures and a list of officers as a condition of institutional recognition. They shall not be required to submit a membership list as a condition of institutional recognition.

C. Membership in campus organizations shall be limited to matriculated students (day or evening) at the college. Membership shall not be restricted by race, religion or nationality. The members shall have sole power to determine organization policy consistent with the regulations of the college.

D. Each organization is free to choose its own adviser. Advisers to organizations shall advise but not control the organizations and their policies.

E. College students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right of petition. Students do not have the right to deprive others of the opportunity to speak or be heard, to invade the privacy of others, to damage the property of others, to disrupt the regular and essential operation of the college, or to interfere with the rights of others.

F. Through the student government organization, college policy committees, or other accepted college procedures, students shall have the right of and responsibility for participating in the formulation and application of college policy. The role of the student government and both its general and specific responsibilities shall be made explicit, and the actions of the student government within the areas of its jurisdiction shall be reviewed only through orderly and prescribed procedures. The procedure for determining college policy shall be clearly defined and made accessible to students in written form.

G. Students shall be allowed to invite and to hear any person of their own choosing. Those routine procedures required by a college before a guest speaker is invited to appear on campus shall be designed only to insure that there is orderly scheduling of facilities and adequate preparation for the event, and that the occasion is conducted in a manner appropriate to an academic community. The college control of campus facilities shall not be used as a device of censorship. It shall be made clear to the academic and larger community that sponsorship of guest speakers does not necessarily imply approval or endorsement of the views expressed, either by the sponsoring group or the institution.

H. Student publications and the student press are a valuable vehicle in establishing and maintaining an atmosphere of free and responsible discussion and of intellectual exploration on the campus. They are a means of bringing student concerns to the attention of the faculty and the institutional authorities and of formulating student opinion on various issues on the campus and in the world at large.

Institutional authorities, in consultation with students and faculty, have a responsibility to provide written clarification of the role of the student publications, the standards to be used in their evaluation, and the limitations on external control of their operation. At the same time, the editorial freedom of student editors and managers entails corollary responsibilities to be governed by the canons of responsible journalism, such as the avoidance of libel, indecency, undocumented allegations, attacks on personal integrity, and the techniques of harassment and innuendo. As safeguards for the editorial freedom of student publications, the following provisions are necessary:

1. Student publications and student press shall be free of censorship and advance approval of copy. Its editors and managers shall be free to develop their own editorial policies and news coverage.

2. Editors and managers of student publications and the student press shall be protected from arbitrary suspension and removal because of student, faculty, administrative, or public disapproval of editorial policy and content.

3. The Editorial Board responsible for the appointment of editors and managers shall be the agency responsible for their removal. An Ad Hoc Publication Board, composed of and elected by students, shall have ultimate jurisdiction over all student publications if and when questions of responsible journalism arise.

4. All college published and financed student publications shall explicitly state on the editorial page that the opinions there expressed are not necessarily those of the college or student body.

The above statement was approved by the faculty May 19, 1969.